1  IRA M. PRESS  *(pro hac vice)*
   MARK A. STRAUSS (California State Bar #196471)
2  KIRBY McINERNEY & SQUIRE, LLP
   830 Third Avenue, 10th Floor
3  New York, NY 10022
   (212) 371-6600
4
   SUSAN G. KUPFER (California State Bar # 141724)
5  GLANCY BINKOW & GOLDBERG, LLP
   455 Market Street, Suite 1810
6  San Francisco, CA 94105
   Telephone:    (415) 972-8160
7  Facsimile:    (415) 972-8166
8  Attorneys for Plaintiff SHIRLEY ZELMAN, TRUSTEE,
   F/B/O SHIRLEY ZELMAN LIVING TRUST
9
   [Other Counsel appear on Signature Page]
10

11                **UNITED STATES DISTRICT COURT**

12               **NORTHERN DISTRICT OF CALIFORNIA**

13

14  - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                        §
15  SHIRLEY   ZELMAN,   TRUSTEE,   F/B/O§      Master File No. C-02-4656 CW
    SHIRLEY ZELMAN LIVING TRUST, on behalf§
16  of plaintiff and all others similarly situated,    §
                                        §      CLASS ACTION
17              Plaintiff,              §
                                        §      AMENDED   COMPLAINT   FOR
18         v.                           §      VIOLATION OF THE SECURITIES
                                        §      EXCHANGE  ACT OF 1934
19  JDS  UNIPHASE  CORPORATION,  JOZEF§
    STRAUS, KEVIN KALKHOVEN, ANTHONY§
20  R. MULLER and CHARLES J. ABBE,    §          DEMAND FOR JURY TRIAL
                                        §
21              Defendants.             §
                                        §
22  - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

23

24

25

26

27

28

1    Plaintiff, by plaintiff's attorneys, alleges the following upon personal knowledge as

2    to plaintiff and plaintiff's own acts, and upon information and belief as to all other matters, based

3    upon an investigation that included a review of the public documents, press releases and conference

4    calls of JDS Uniphase Corporation, news media and securities analysts' reports concerning JDS

5    Uniphase, and court filings including documents filed in the consolidated shareholder action *In re*

6    *JDS Uniphase Corporation Securities Litigation*, Master File No. C 02-1486 CW, pending in this

7    District before this Court, which in turn is based in part on detailed information provided to plaintiffs

8    in that action by approximately 50 former JDS Uniphase Corporation employees (hereinafter,

9    "Confidential Witnesses").

10                              **SUMMARY AND OVERVIEW**

11    1.    This is a securities fraud class action:

12    (a)    on behalf of all purchasers, between March 6, 2001 and July 26, 2001 (the

13    "Class Period"), of 26% GOALs due September 12, 2002 (hereinafter, the "GOALs") - a security

14    which was not issued by JDS Uniphase Corp. but whose value, as described in more detail below

15    at ¶¶ 31-46, was nevertheless expressly linked to the trading price of the common stock of JDS

16    Uniphase Corporation ("JDS" or the "Company");

17    (b)    against JDS Uniphase and certain of its officers and directors (the "Individual

18    Defendants");

19    (c)    for violations of the Securities Exchange Act of 1934 (the "1934 Act").

20    2.    JDS Uniphase is a provider of fiber optic components and modules which

21    form the building blocks for fiber optic networks.  JDS  sells to telecommunications and cable

22    television system providers worldwide (which are commonly referred to as Original Equipment

23    Manufacturers or "OEMs", and include Alcatel, Ciena, General Instrument, Lucent, Nortel, Pirelli,

24    Scientific Atlanta, Siemens and Tyco). The Company's components and modules perform both

25    optical-only (passive) and optoelectronic (active) functions within these networks. The products

26    include semiconductor lasers, high-speed external modulators, transmitters, amplifiers, couplers,

27    multiplexers, circulators, tunable filters, optical switches and isolators for fiberoptic applications.

28

3.     During and prior to the Class Period, defendants materially misrepresented the Company's financial results, financial health, value and prospects through dissemination to the public of materially false and misleading statements (detailed in ¶¶ 83-169, *infra*) concerning, *inter alia*, the Company's revenues, the Company's inventory, the Company's goodwill, assets and balance sheet, and demand for the Company's products.  In fact, defendants' public statements complained of here were quite different, and materially and misleadingly more positive, than what defendants then knew (as detailed in ¶¶ 47-82, 170-182), or were deliberately reckless in not knowing, to be the case concerning the Company's revenues, the Company's inventory, the Company's goodwill, assets and balance sheet, and demand for the Company's products.

4.     Defendants' materially false and misleading public statements not only caused JDS stock to trade at artificially-inflated prices as high as $135 per share[1], but caused the GOALs to be issued and to be traded at artificially inflated prices (*see* ¶¶ 31-46).

5.     Defendants were highly motivated to cause and maintain such inflated values. First, defendants made approximately $35 *billion* in acquisitions during the Class Period using as sole currency the (inflated) shares of JDS stock.  These acquisitions were made significantly cheaper for the defendants, and significantly less dilutive to the defendants, by virtue of the inflated currency used, which allowed defendants to use fewer shares to pay for the acquisitions.  Second, the four Individual Defendants named in this action, while in possession of the material adverse information detailed in ¶¶ 47-82, received more than $500 million from their personal insider sales of JDS stock.

6.     Such stock price inflation would have and did have the foreseeable result of artificially inflating the price of GOALs, because – as detailed in ¶¶ 31-46 – the value of the GOALs was expressly linked to JDS' stock price.

7.     No later than mid-2000, defendants knew (as detailed in ¶¶ 47-82, *infra*) that: (i) demand for the company's products was in steep decline, which would necessitate downwards revisions in the company's projections; (ii) that the company's inventory levels were climbing

---

[1] All share and per-share amounts are adjusted to reflect 2-for-1 stock splits on December 30, 1999 and March 13, 2000.

sharply, which – given the state of market demand – would require the company to write down inventory values by hundreds of millions of dollars; (iii) that the company's assets and goodwill were massively overstated and would require multi-billion dollar writedowns; and (iv) and that the company's entire structure was unsustainable and would require severe downsizing.

8.      Defendants disclosed none of this to the public at the time.  Instead, the Individual Defendants, in August 2000, reduced projections *internally* (i.e., without public disclosure) (*see* ¶¶ 175-182, *infra*) and engaged in their most concentrated period of insider selling, receiving approximately $400 million from their sales of JDS stock in August 2000 alone.  As the largest of defendants' acquisitions – the purchase of SDL, Inc. ("SDL"), with an original price tag of $35 billion -- experienced regulatory delays, defendants maintained their public silence and withheld disclosure of the adverse knowledge in their possession.

9.      The SDL acquisition closed on February 12, 2001.  The next day, defendants disclosed to the public, for the first time, concrete reductions to the company's financial guidance stemming from reduced demand.  Even so, defendants did not then disclose the problems with the company's swelling (and highly overvalued) inventories, its bloated assets and goodwill, and its entire business structure.

10.      On or about March 8, 2001, $51 million of 26% GOALs were initially offered to the public, and on March 12, 2001, the 26% GOALs began trading on the American Stock Exchange, closing at approximately 99% of the face value at which they had been issued.  As further detailed below (*see* ¶¶ 31-46, *infra*), the initial value and trading value of the GOALs were intrinsically linked to the price of JDS  stock:

(a)      **Initial Value**.  The GOALs, issued in units of $1,000 face value, contained a conversion feature making them, given certain circumstances upon the date of redemption, convertible into 35.5556 shares of JDS stock. This conversion ratio (i.e. 35.5556 shares of company stock for each $1,000 face value GOAL) was set using the *inflated* price ($28.125 per share) of JDS stock at the time of the GOALs offering (i.e., $28.125 multiplied by 35.5556 equals $1,000).  Had defendants disclosed the negative information then in their possession prior to the GOALs offering,

1   the contemporary price of JDS would have deflated to below $28.125, which would in turn have

2   changed the conversion ratio (e.g., had the company's stock price declined to $10 per share, each

3   $1,000 face value of GOALs would have a conversation ratio involving 100 shares of company

4   stock).

5            (b)   **Trading Value**. Because of their conversion feature, the value of the GOALs

6   was intrinsically linked to and dependent upon the price of JDS stock. As explained in further detail

7   below (*see* ¶¶ 31-46, *infra*), the GOALs were structured so that, should JDS stock appreciate in

8   value between the offering (in March 2001) and the redemption of the GOALs (in September 2002),

9   the GOALs would not convert into 35.5556 shares of JDS stock, and investors would receive, in

10  addition to their 26% annual interest rate, merely a full return of their principal (e.g., $1,000 cash for

11  each $1,000 face value GOAL). The conversion of the GOALs into JDS stock would only occur

12  if JDS' stock price on September 9, 2002 was below $28.125 per share – i.e., below the price of JDS

13  stock at the time of the GOALs offering in March 2001. In that instance, persons redeeming their

14  26% GOALs would, in addition to their interest, receive 35.5556 shares of JDS stock for each

15  $1,000 principal amount of 26% GOALs (e.g., a purchaser of $1,000 face amount of GOALs would

16  receive 35.5556 shares of JDS stock no matter the price of the stock). This feature of the GOALs

17  meant that, should JDS' stock price decline (or threaten to decline) to levels below $28.125, the

18  redemption value of the GOALs – and thus their trading value – would correspondingly decline to

19  approximate the redemption value in terms of the worth of the JDS stock. For instance, if the price

20  of JDS stock was $10 per share in September 2002, then GOALs investors would receive – for every

21  $1,000 face value GOAL redeemed – not a full return of their principal, but rather 35.5556 shares

22  of JDS stock which, at $10 per share, meant a return of $356 for a $1,000 face value GOAL. Thus,

23  in this instance, the market would value GOALs not at 100% of their face value, but rather at 35%

24  of their face value (because each holder of a $1,000 face value GOAL could expect to redeem it for

25  only $356 worth of JDS stock).

26           11.   Shortly after the GOALs were offered in early March 2001, defendants, on

27  April 24, 2001, disclosed that they were considering a write-down of the company's goodwill and

28

asset value, and disclosed their decision to implement a "Global Realignment Program" – a downsizing program involving large layoffs and the closing of many facilities – in light of reduced demand and the company's financial circumstances.

12.    On June 14, 2001, defendants once again publicly reduced the company's financial projections, and disclosed that they would soon be writing off an unspecified portion of the value they had been reporting for the company's inventory.

13.    Finally, on July 26, 2001, defendants announced: (i)  that defendants were writing off *$44 billion* in goodwill, thereby incurring the largest loss ever reported in corporate history; (ii)  that defendants were writing down the reported value of JDS' inventory by $270 million; (iii) that financial results for the previous fiscal year had not met defendants' multiply-reduced guidance; (iv) that financial guidance for the current fiscal year was to be reduced yet further; and (v) that financial results for certain previous periods would have to be restated and reduced.

14.    The April 24, June 14 and July 26, 2001 disclosures each caused the share price of JDS , and the trading price of the GOALs, to decline.  After defendants' July 26, 2001 disclosures, JDS  shares fell to approximately $8 per share, while the GOALs fell to 65.5% of the face value at which they had been issued.

15.    After July 26, 2001, as defendants continued to report extremely disappointing results for JDS , the prices of the company's stock and the GOALs continued to decline in lockstep. At the time of their redemption in September 2002, because JDS  stock (and thus the GOALs redemption value) had declined so severely, the GOALs were trading at only 9% of their face value.

## JURISDICTION AND VENUE

16.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the 1934 Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.  The claims asserted herein arise under sections 10(b) and 20(a) of the Exchange Act as amended, 15 U.S.C. § 78j(b) and § 78t(a) and rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.

1    17.    Venue is proper in this District pursuant to §27 of the 1934 Act and 28 U.S.C.

2    §1391(b).  Many of the acts and transactions giving rise to the violations of law complained of

3    herein, including the preparation and dissemination to plaintiff and other investors of false and

4    misleading information, occurred in this district.  In addition, defendant JDS maintains its principal

5    executive office within this district.

6                                          **THE PARTIES**

7    18.    Plaintiff Shirley Zelman, Trustee, f/b/o Shirley Zelman Living Trust,

8    purchased GOALs, as described in the certification filed with her initial complaint, and was damaged

9    thereby.

10    19.    Defendant JDS Uniphase is a provider of fiber optic components and modules

11    and its products include semiconductor lasers, high speed external modulators, transmitters,

12    amplifiers, couplers, multi-plexer and optical switches. The Company's stock trades in an efficient

13    market on the Nasdaq National Market System.

14    20.    Defendant Jozef Straus ("Straus") was, during the Class Period, the Company's

15    Co-Chairman of the Board and, since May 2000, has been Chief Executive Officer of the Company.

16    While in possession of undisclosed adverse information about JDS, Straus sold 1.67 million shares

17    of his JDS stock for proceeds of $183 million.  The bulk of Straus' insider sales occurred in August

18    2000, when he sold approximately 1.47 million shares for proceeds of approximately $173 million.

19    21.    Defendant Kevin Kalkhoven ("Kalkhoven") was, from June 1999 to May

20    2000, the Company's Chief Executive Officer. While in possession of undisclosed adverse

21    information about JDS, Kalkhoven sold 2.36 million shares of his JDS stock for proceeds of $222.5

22    million.   The bulk of Kalkhoven's insider sales occurred in August 2000, when he sold

23    approximately 1.3 million shares for proceeds of approximately $159 million.

24    22.    Defendant Anthony R. Muller ("Muller") was, during the Class Period, Chief

25    Financial Officer, Executive Vice President and Secretary of the Company. While in possession of

26    undisclosed adverse information about JDS, Muller sold 535,000 shares of his JDS stock for

27

28

1    proceeds of $52.0 million. The bulk of Muller's insider sales occurred in August 2000, when he sold

2    365,000 shares for proceeds of approximately $42 million.

3        23.    Defendant Charles J. Abbe ("Abbe") was, during the Class Period, President

4    and Chief Operating Officer of JDS . While in possession of undisclosed adverse information about

5    JDS, Abbe sold 490,000 shares of his JDS stock for proceeds of $45.8 million. The bulk of Abbe's

6    insider sales occurred in August 2000, when he sold 150,000 shares for proceeds of approximately

7    $17.6 million.

8        24.    The individuals named as defendants in ¶¶ 20-23 are referred to herein as the

9    "Individual Defendants."

10        25.    Each of the Individual Defendants (with the partial exception of Defendant

11    Kalkhoven, who retired from his positions as President and Chief Executive Officer in May 2000),

12    reviewed and approved press releases issued by the company during the Class Period. Additionally,

13    as detailed below throughout ¶¶ 83-169, each of the Individual Defendants made numerous false and

14    misleading statements about the company during conference calls with analysts and the news media,

15    which statements were incorporated into analyst reports and news stories.

16        26.    The Individual Defendants signed certain of the documents that JDS filed

17    with the SEC which contained materially false and misleading statements: Strauss signed the

18    company's Form 10-K for fiscal 2000 (the "Fiscal 2000 10-K"), and Muller signed the Fiscal 2000

19    10-K and every Form 10-Q filed by JDS during the Class Period.

20        27.    The Individual Defendants, because of their positions with the Company,

21    possessed the power and authority to control the contents of JDS' quarterly reports, press releases

22    and presentations to securities analysts, money and portfolio managers and institutional investors,

23    *i.e.*, the market. Each defendant was provided with copies of the Company's reports and press

24    releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and

25    opportunity to prevent their issuance or cause them to be corrected.

26

27

28

Complaint for Violation of the
Securities Exchange Act of 1934            - 8 -

28.     Each of the Individual Defendants had access to the company's internal "Redbook" (*see* ¶¶ 175-182, *infra*) which, *inter alia*, tracked projected customer demand against internal company projections.

29.     Each of the Individual Defendants had access to the company's Oracle database system (*see* ¶¶ 171-172, *infra*) which, *inter alia*, tracked the company's historical and projected customer orders, sales and inventory levels.

30.     Because of their positions and access to material non-public information available to them but not to the public, each of these defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein at, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

**THE GOALS**

31.     On or about March 8, 2001, $51 million of GOALs were initially offered to the public by UBS AG.  On March 9, 2001, the American Stock Exchange issued a press release announcing that it would list the GOALs on its exchange under the symbol "NYJ.A", and on March 12, 2001, GOALs began public trading, closing at approximately 99% of the face value at which they had been issued.

32.     The GOALs were "equity-linked" debt securities, issued in units of $1,000 face value, bearing an interest rate of 26% per annum and coming to maturity on September 12, 2002 (i.e., 18 months after their issuance).

33.     The initial value, intrinsic structure, and trading prices of the GOALs were fundamentally linked to the price of JDS stock.  Purchasers of GOALs would receive, upon redeeming the GOALs at their maturity, a payment whose nature (i.e., cash or JDS  stock) and amount were both a function of the JDS' stock price.  Specifically, the two redemption options were:

(a)     if JDS' stock price was above $28.125 per share on September 9, 2002, then purchasers of GOALs would receive, in exchange for redeeming their GOALs, the full principal

1  amount of those GOALs (e.g., a purchaser of $1,000 face amount of GOALs would receive $1,000
2  in cash).

3      (b)   If JDS' stock price was below $28.125 per share on September 9, 2002, then
4  persons redeeming their GOALs would receive 35.5556 shares of JDS stock for each $1,000
5  principal amount of GOALs (e.g., a purchaser of $1,000 face amount of GOALs would receive
6  35.5556 shares of JDS stock no matter the price of the stock).

7      34.   The logical implications of this structure are clear.  35.5556 shares of JDS
8  stock, if that stock has a price of $28.125 per share (i.e., the share price when the GOALs were
9  issued in March 2001), have the value of $1,000.  Therefore, were JDS stock to appreciate in value
10 between the issuance and redemption of the GOALs (i.e., March 12, 2001 and September 9, 2002),
11 purchasers of GOALs would not enjoy such appreciation but would merely receive their principal
12 back in cash (as well as their 26% interest rate).  However, were JDS stock to depreciate in value
13 between the issuance and redemption of the GOALs (i.e., March 12, 2001 and September 9, 2002),
14 purchasers of GOALs would receive shares of JDS stock - 35.5556 shares per $1,000 principal
15 amount of GOALs - whose value would be less than the principal amount of the GOALs.  If, for
16 instance, JDS stock fell to $20 per share by September 9, 2002; an investor who purchased $1,000
17 in principal amount of GOALs would receive 35.5556 shares of JDS stock having a total value of
18 approximately $711.  If JDS stock fell to $10 per share by September 9, 2002, an investor who
19 purchased $1,000 in principal amount of GOALs would receive 35.5556 shares of JDS stock having
20 a total value of approximately $356.

21     35.   Thus, the valence and magnitude of GOALs' investors' return was, more than
22 anything else, a function of JDS' stock price.

23     36.   The Prospectus Supplement for the GOALs, filed by UBS with the SEC on
24 or about March 12, 2001 made this point front and center, stating:

25     Several factors... will influence the value of the GOALS.  **WE EXPECT THAT
26     GENERALLY THE MARKET PRICE OF JDS UNIPHASE CORPORATION
       COMMON STOCK ON ANY DAY WILL AFFECT THE VALUE OF THE
27     GOALS MORE THAN ANY OTHER SINGLE FACTOR.** (Prospectus, S-5)
       (emphasis added)

28

The GOALS combine features of equity and debt.  The terms of the GOALS differ from those of ordinary debt securities in that we will NOT pay you a fixed amount at maturity if the market price of JDS Uniphase common stock is less than $28.125 on the determination date.  In that event, our payment to you at maturity will be 35.5556 shares of JDS Uniphase Corporation common stock per $1,000 face amount of GOALS.  THEREFORE, IF THE MARKET PRICE OF JDS UNIPHASE CORPORATION COMMON STOCK ON THE DETERMINATION DATE IS LESS THAN $28.125, WE WILL PAY YOU AN AMOUNT OF JDS UNIPHASE CORPORATION COMMON STOCK WITH A MARKET VALUE LESS THAN THE PRINCIPAL AMOUNT OF THE GOALS.  ACCORDINGLY, YOU CAN LOSE SOME OR ALL OF THE AMOUNT THAT YOU INVEST IN THE GOALS. (Prospectus, S-5).

37.     As structured, the GOALs offered potential investors a definite upside potential (26% annual interest for up to one and one half years, and at best a full return of their principal) and a potentially unlimited downside – all dependent on the price of JDS stock.  Given this structure, the GOALs constituted a reasonable investment for investors who: (i) desired a high current rate of return (the interest rate); and (ii) believed that JDS' downside, if any, was limited.

38.     Prior to the GOALs offering in March 2001, as detailed below (¶¶ 83-169), defendants materially misrepresented: (i) JDS' inventory (whose value they inflated when reporting it to the public); (ii) JDS' assets and goodwill (whose publicly-reported value was likewise inflated); (iii) demand for JDS' products (likewise inflated); (iv) JDS' basic business model (which, unbeknownst to investors, defendants had already concluded was untenable and in need of drastic downsizing); and (v) JDS' financial results, financial health, value and prospects through dissemination to the public of materially false and misleading statements concerning, *inter alia*, the Company's revenues, demand for the Company's products, the Company's inventory, and the Company's goodwill, assets and balance sheet.

39.     Defendants' misrepresentations regarding the Company's basic condition, demand for the company's products, and the company's revenue, inventory, assets and goodwill all functioned, at the time of the GOALs offering in March 2001, to inflate the value of JDS stock, and thereby to inflate the value of the GOALs – whose fundamental structure and conversion ratio were set according to the price of JDS stock on March 9, 2001 such that each $1,000 GOAL would convert into 35.5556 shares of JDS stock (then inflatedly priced at $28.125 per share).  Absent such misrepresentations, JDS stock would have traded at lower prices at the time of the GOALs offering

1   (e.g., $20 per share), which in turn would have required the GOALs to have higher conversion ratios

2   (e.g., 50 shares of JDS stock for each $1,000 GOAL), which would have resulted in a higher return

3   to investors upon redemption (i.e., investors would receive more JDS shares for each $1,000 in

4   GOALs redeemed).

5          40.     In short, because of the price inflation caused by defendants, GOALs investors

6   purchased a security that could return to them a *preset* amount of JDS shares – with that *preset*

7   *amount, determined in March 2001, itself being a product of the price inflation then affecting JDS*

8   *stock.*

9          41.     Furthermore, defendants' misrepresentations regarding the Company's basic

10  condition, demand for the company's products, and the company's revenue, inventory, assets and

11  goodwill all functioned, at the time of the GOALs offering in March 2001 to mislead GOALs

12  investors about the extent of the massive downside that defendants themselves then knew – and

13  would shortly reveal to the public -- about the Company.

14         42.     On April 24, 2001, approximately one and one half months after the GOALs

15  were issued with their conversion ratio set according to JDS' inflated share price, defendants issued

16  a press release disclosing that JDS might write down its goodwill and assets by billions of dollars,

17  and that JDS would sharply downsize operations, eliminating 30% of facilities and 20% of its

18  employees.  Though defendants had long been aware (*see* ¶¶ 47-82) that they would have to enact

19  the downsizing and the write-off, the market was surprised by these announcements and their

20  magnitude.  JDS stock fell approximately 14% (from $24.18 on April 23, 2001 to $20.82 on April

21  24, 2001), and the GOALs likewise fell 8.5% (from 94.75% of par value on April 23, 2001 to

22  86.75% of par value on April 26, 2001).

23         43.     On June 14, 2001, defendants issued a press release announcing that JDS

24  would likely have to write-off approximately $225-$250 million in the reported value of its

25  inventory.  JDS stock fell 9% (from $13.81 on June 14, 2001 to close on June 15, 2001 at $12.44

26  per share), while the GOALs likewise fell 8.7% (from 86.5% of par value on June 14, 2001 to 79%

27  of par value on June 15, 2001).

28

Complaint for Violation of the
Securities Exchange Act of 1934              - 12 -

44.     Finally, on July 26, 2001, defendants disclosed that they were writing off $270 million in inventory and that they were writing down goodwill and assets by $44.8 billion.  As a result, on July 27, 2001, JDS  stock dropped to $8.55 per share, while the GOALs fell to 58.25% of their par value.

45.     While the GOALs were not issued by JDS , the impact upon these securities of material misrepresentations concerning the operations and finances and JDS was clearly foreseeable given the express link between the GOALs and JDS stock.

46.     Because the GOALs were issued pursuant to a Prospectus filed with the SEC on or about March 12, 2001, defendants were clearly on notice concerning the existence of the GOALs and the fundamental dependence of the GOALs' value upon JDS' stock price.

**MATERIAL ADVERSE INFORMATION KNOWN BY DEFENDANTS BEFORE AND DURING THE CLASS PERIOD**

47.     As alleged in detail in the paragraphs below, defendants were actually aware – or severely reckless in not knowing – of material adverse information concerning JDS' operations and financial results that rendered their public statements prior to July 26, 2001 materially false and misleading.

48.     Specifically, defendants were aware: (i) that JDS' reported revenues during 1999, 2000 and 2001 were false and inflated due to defendant's improper revenue recognition practices; (ii) that JDS' reported revenues during at least parts of 1999 and 2000 had been inflated by highly fraudulent schemes pursuant to which JDS employees falsified product shipments in order to recognize and report (false) revenue; (iii) that, at all times after the Summer of 2000, the company's inventories were rising sharply, in part as a result of customer cancellations and returns, and that large portions of this inventory were effectively worthless and would have to be written off; (iv) that, at all times after the Summer of 2000, defendants had determined that the Company's entire business structure was untenable given market conditions, and in need of sharp downsizing; and (v) that, at all times after the Summer of 2000, the company's goodwill was materially overstated and in need of steep writedown.

1    49.    Despite such knowledge, defendants continued to issue throughout 1999, 2000

2  and part of 2001 materially false and misleading statements and documents concerning JDS'

3  revenues, inventory, goodwill, and business operations, as well as – prior to the Class Period –

4  numerous materially false and misleading statements concerning the state of demand for the

5  Company's products.  Defendants' materially false and misleading statements had the effect of

6  inflating not only JDS' stock price during this period, but the price of the GOALs from their March

7  2001 offering until July 26, 2001.

8

9    A.    **JDS Uniphase Improperly Recognized Revenue from Shipments of Products
       That it Still Owned and that Were Shipped Under Full Right of Return**

10    50.    According to court filings in related actions, confidential witnesses – former

11  employees of JDS – confirmed that JDS  had arrangements with some of its largest customers,

12  including Nortel Networks and Lucent (who together accounted for more than 20% of JDS' sales

13  during the Class Period) pursuant to which JDS would ship large amounts of its products to such

14  customers who, in turn, would store the products in their stockrooms and inventories without being

15  liable for payment until the product was actually used and with full rights of return.

16    (a)    Confidential Witness No. 9 (a Senior Product Line Manager in Ottawa) stated

17  that JDS had such an arrangement with Nortel.

18    (b)    Confidential Witness No. 10 (an engineering manager in Bloomfield,

19  Connecticut) stated that JDS had such an arrangement with Lucent.

20    (c)    Confidential Witness No. 11 (a Senior Manufacturing Engineer in San Jose)

21  stated that JDS had such arrangements with many customers.

22    51.    Pursuant to Generally Accepted Accounting Principles ("GAAP"), such

23  transactions amount to consignment sales, and revenue should not be recognized until the customer

24  pulls the product from its inventory, thereby eliminating the right of return and incurring the

25  obligation to pay JDS for the products pulled (SFAS No. 48, ¶ 6).

26    52.    JDS, however, recognized the revenue immediately upon shipment.

27

28

53.     By immediately recognizing revenue on its shipments to customer with whom it had such agreements, defendants, violating GAAP, artificially inflated JDS' publicly-reported revenues before and during the Class Period.  Given that such inflation occurred in connection with shipments to customers who accounted for at least 20% of JDS' sales throughout the Class Period, defendants' overstatement of revenues due to this practice was material.

**B.     JDS Uniphase Improperly Recognized Revenue from Fraudulent Shipments of Products During 1999 and 2000**

54.     Beginning no later than the first quarter of fiscal 2000 (the quarter ending September 30, 1999) and lasting at least through the end of fiscal 2000 (ending June 30, 2000), JDS reported thoroughly fraudulent revenues which were "recognized" from faking shipments of products in the days just prior to the end of each quarter.  According to four Confidential Witnesses working in at least two facilities (Horsham, Pennsylvania and Bloomfield, Connecticut), plant executives created Potemkin shipments in which trucks filled with JDS products would leave the JDS facilities shortly before the quarter end, only to return with those same products after the quarter end.  In between the exit and the re-entrance of the products, JDS would recognize revenues from the products ostensibly "shipped" pursuant to this practice.

(a)     Confidential Witness No. 1 (a production planner at the Horsham plant) and Confidential Witness 7 (a former controller at Horsham) stated that executives at Horsham recognized quarterly revenues of $1-$3 million from this practice.  Both Confidential Witnesses stated that this practice was approved by Eitan Gertel, who reported to Defendant Kalkhoven.

(b)     Confidential Witness No. 12 (the former CEO of the Hatboro Delivery Service, which provided the trucks used for such false shipments) confirmed the existence of this fraudulent practice.

(c)     Confidential Witness No. 13 (who tested OC-48 modulators in Bloomfield, Connecticut) stated that he heard that, during the Summer of 2000, an identical practice of "shipping to make the books look good" was occurring at the Bloomfield plant.

55.     SEC Staff Accounting Bulletin No. 99 states that intentional manipulations of a Company's financial statements, no matter how small, are unlawful.

**C.   Defendants Were Aware of Weakening Demand for, and Rising Inventories of, JDS Uniphase's Products**

56.   As numerous Confidential Witnesses verify, by early Spring 2000 signs of reduced customer demand were widespread at JDS manufacturing plants throughout the United States and Canada, including the Company's corporate headquarters in San Jose and Ottawa.

(a)   According to Confidential Witness No. 16 (a Product Line Manager in one of JDS' Ottawa plants), demand began to slow down noticeably in March 2000: "It was dead . . . every shift was fighting for stuff to do" and people were "doing re-do work" because there wasn't enough new work to go around. "We would go to work in the morning, and sit there for an hour or an hour and a half doing nothing."

(b)   Confidential Witness No. 16 added that by April 2000, "lead hands" and other supervisors were overheard saying in JDS' offices that "demand was slow and inventory was rising fast." Confidential Witness No. 16 also stated that **senior management, including defendants Straus and Kalkhoven, knew of these facts from April 2000 on**.

(c)   Confidential Witness No. 17 (a test engineer in Ottawa) noted that in early to mid 2000 "massive" amounts of returned materials came back from Nortel. Confidential Witness No. 17 stated that Nortel was returning the merchandise to get credit for unused or unsold products – not because the products were damaged or defective. The engineer added that the returns "surely amounted to many millions of dollars of lost income to JDS." Because these custom made products could not be sold to others, they were excess inventory as of that time.

(d)   According to Confidential Witness No. 18 (an Information Technology Engineer in San Jose), in or around March 2000, JDS employees began to talk about declining demand for the Company's products. Confidential Witness No. 19 (a Senior Financial Analyst in San Jose) confirmed that order cancellations in the San Jose plant – the Company's largest plant in the United States – began in earnest in March or April 2000. Likewise, Confidential Witness No. 11 (a Senior Manufacturing Engineer in San Jose), stated that during that same time period, employees at JDS became aware that "demand had come to a halt."

Complaint for Violation of the
Securities Exchange Act of 1934                    - 16 -

(e)     So, too, Confidential Witness No. 20 (a Clean Room Technician at the Bloomfield plant), stated that the downturn in JDS's business started "right after winter" 2000. Cisco, Lucent, Ciena and Alcatel cancelled orders once or twice every 1 1/2 or two weeks beginning in March and April 2000; rooms of inventory were stacked up in the Bloomfield plant, requiring JDS to move people to another building to make room for all of the product and equipment lying around. Confidential Witness No. 21 (a Fiber Optic Technician at the Bloomfield plant), confirmed that demand decreased in the Spring of 2000.  Confidential Witness No. 22 (a Materials Planner at the Bloomfield plant), reported that work orders "decreased drastically in or around April 2000 and into 2001."  Confidential Witness No. 22 added that "it got to the point where there was so much down time" that the planner began "concocting training topics for work cell members, simply to keep them appropriately busy."   Likewise, Confidential Witness No. 10 (an Engineering Manager in Bloomfield), stated that in or around the Spring of 2000, customers began to reduce their monthly requirements of JDS products and, in some months, asked that no product be shipped at all.

(f)     Finally, according to Confidential Witness No. 5 (a former Logistics Analyst in West Trenton, New Jersey, one of JDS's top five plants in the United States), in or around April 2000, Lucent and Nortel – the Company's two biggest customers – declined to take delivery on orders, leaving that facility with approximately $40 million in excess inventory.

57.     In the Spring of 2000, despite JDS' practice of "just in time" manufacturing with minimal inventory on-hand, the Company's inventory began to rise sharply as a result of widespread and large reductions in customer orders.  This rise was immediately reflected on JDS' Oracle system and Redbook reports (*see* ¶¶ 171-182), and the reports generated therefrom were provided to the Individual Defendants, including defendants Muller and Kalkhoven.

(a)     As previously noted (*see* ¶ 56f), in or around April 2000, Lucent and Nortel refused to take delivery on approximately $40 million in prior orders.  As a result, the Trenton facility was left with approximately $40 million in excess inventory, which it was not able to sell to any other customer due to the unique nature of the products.

1    (b)    According to Confidential Witness No. 23 (a Manufacturing Supervisor in

2    Bloomfield), in the early Spring of 2000, Lucent returned 3,000 OC-192 modulators (which cost

3    approximately $5,000 each) to Bloomfield due to corrosion.  However, when JDS offered to replace

4    the modulators, Lucent refused to take a replacement of the $15 million order, indicating that the

5    return was due to demand issues rather than to quality issues.  These returned products were excess

6    inventory as of the time they were returned.

7    (c)    In April 2000, according to Confidential Witness No. 16 (a Product Line

8    Manager in Ottawa), an Ottawa plant was cleared out in order to stock inventory.  The plant was

9    soon filled up.  According to Confidential Witness No. 16, this was highly unusual because JDS'

10   previous practice was to ship product out as soon as it was produced rather than to stock finished

11   goods in house. Confidential Witness No. 26 (a member of JDS' Erbium Department in Ottawa)

12   stated that inventory of erbium (spooled rolls of fiber) began to build up in June 2000.

13   (d)    According to Confidential Witness No. 10 (an Engineering Manager in

14   Bloomfield), by the Spring of 2000, Lucent's inventory of JDS products had built up to the point that

15   they had no room to store additional products, prompting Lucent to ask JDS to hold its inventory

16   rather than ship it to Lucent as had been done in the past.

17   58.    The signs of reduced customer demand for JDS products, and the signs of

18   climbing inventories of JDS products, intensified in May through July 2000 at JDS' largest

19   manufacturing plants throughout the U.S. and Canada.  The declining demand and rising inventories

20   were immediately reflected on the Oracle system, and the reports generated therefrom were provided

21   to the Individual Defendants, including Muller and Kalkhoven.  Despite the fact that customers were

22   reducing and canceling orders during this time frame, and that JDS Uniphase inventory was piling

23   up with unsellable products, defendants continued to publicly maintain that demand remained robust

24   and to report inflated values for JDS' inventory.

25   (a)    Confidential Witness No. 32 (a Team Leader in JDS' Bloomfield and Windsor

26   plants), noticed a severe downturn in demand in May 2000.  People were laid off at that time and

27   unsold inventory was building up in the Cable and Specialty Group.  Likewise, according to

28

1  Confidential Witness No. 33 (a Production Supervisor in Bloomfield), it was "widely known" by

2  mid-2000, that there was a "glut" of JDS components building up on the shelves of customers that

3  the customers could not sell.  Similarly, according to Confidential Witness No. 23 (a Manufacturing

4  Supervisor in Bloomfield) demand had fallen greatly by the Summer of 2000: whereas previously

5  the plant had produced 400 OC-48 modulators per day, they began producing less than 100.

6          (b)      According to Confidential Witness No. 34 (an engineer in Bloomfield), the

7  Summer of 2000 saw an unusual number of order cancellations and returns.  Many of the products

8  returned were tested by JDS and found not to be defective (*i.e.*, they were simply not wanted).

9          (c)      The Company's problems were by not confined to Bloomfield.  Confidential

10  Witness No. 7 (the former Controller at Horsham, one of JDS' five largest plants in the U.S.), stated

11  that business took a "nose-dive" in the fourth quarter of fiscal year 2000 (*i.e.*, quarter ending June

12  30, 2000), with revenue declining by approximately 70% during that quarter.

13          (d)      Confidential Witness No. 5 (the West Trenton Logistics Analyst), stated that

14  by mid-2000, "no firm orders were coming in" even from the Company's most established customers

15  like Lucent, Cisco and Nortel.  According to Confidential Witness No. 5, "visibility" was not high,

16  meaning that by mid-2000, JDS officials could not say with a high degree of confidence that firm

17  orders would be coming in with regularity.  Confidential Witness No. 5 added that at or around that

18  same time, two of the biggest users of JDS' OC-192 product, Lucent and Nortel, were canceling

19  orders and refusing deliveries on orders.

20          (e)      Matters were likewise in JDS' San Jose facility.  According to Confidential

21  Witness No. 35 (an Opto-Mechanical Engineer at the San Jose plant), demand decreased beginning

22  in April 2000.  Confidential Witness No. 2 (an Account Manager in San Jose) further confirmed that

23  by late Spring 2000, there was widespread "pushing out" of orders for JDS products by both large

24  and small customers.  Confidential Witness No. 36 (a former Senior Electro-Mechanical Inspector

25  in San Jose) indicated that customers began canceling orders in mid-2000; and Confidential Witness

26  No. 37 (a Senior Quality Engineer in San Jose) stated that by mid-July 2000 customers were

27  canceling  orders  and  sending  back  inventory  that  they  could  not  sell  to  their  own  clients.

28

Complaint for Violation of the
Securities Exchange Act of 1934                    - 19 -

1   Confidential Witness No. 19 (a Senior Financial Analyst in San Jose), stated that by mid-2000,

2   orders from major customers such as Nortel, Ciena, Alcatel and ONI Systems began to dry up.

3          (f)      Similarly, according to Confidential Witness No. 24 (a former Logistics

4   Supervisor at the former E-TEK facility in San Jose), immediately after JDS' acquisition of E-TEK

5   in June 2000, Nortel and Alcatel returned large amounts of products during this period.  Some

6   customers said that the products were defective, but when they were sent to the Final Analysis

7   department it was discovered the products were not defective, leading to the obvious conclusion that

8   the customers did not need them.

9          (g)      Confidential Witness No. 26 (an employee in JDS' Erbium Department in

10  Ottawa), stated that Nortel returned "a lot" of products to JDS in Ottawa in June and July 2000.

11  Nortel had previously ordered the materials, but began sending them back without penalty when its

12  own production and demand had dropped. Confidential Witness No. 26 further noted that in response

13  to the downturn in business in May or June 2000, JDS started cutting staff.  Employees were told

14  that because Nortel was scaling back, JDS had to also.

15         (h)      Confidential Witness No. 9 (a Senior Product Line Manager in Ottawa), stated

16  that in the Summer of 2000, senior people in Ottawa, including Senior Vice President Joe Ip (who

17  sold $80.6 million of JDS stock in August 2000), stated on various occasions that JDS had over-

18  capacity, was building too much inventory, and that they didn't know what they were going to do

19  with the products they were building.  This slowdown related to WDM filters – JDS' top revenue

20  producing product in Ottawa.

21         59.     Throughout the remainder of 2000, news at JDS only worsened as customers

22  continued canceling and pushing out their orders and refusing deliveries of JDS products they had

23  previously ordered.

24         (a)      Confidential Witness No. 31 (a Product Engineer in Ottawa) reported that in

25  August 2000, Lucent cancelled a "huge order" of post filters that was at least in the "tens of millions

26  of dollars."  Confidential Witness No. 47 (an Order Management Specialist in Ottawa) confirmed

27

28

1    that demand for JDS products "tailed off" in August 2000; similarly, Confidential Witness No. 46

2    (a Senior Materials Manager in Ottawa), stated that business had leveled off by August 2000.

3            (b)     Confidential Witness No. 41 (an Engineering Technician in Bloomfield)

4    recalled that orders came to a "halt" in mid to late 2000.  Confidential Witness No. 48 (a utility

5    worker in the wavelocker group in Bloomfield) was told in or around September 2000 by her

6    supervisor, Jeff Horzack, that Lucent was canceling "huge amounts" of orders and other customers

7    were canceling as well.

8            (c)     Finally, Confidential Witness No. 31, stated that prior to Christmas 2000,

9    Nortel canceled a $100 million order known as the "Mosaic Project."

10           60.     As a result of the ever-falling demand, excess inventories at JDS (*i.e.*,

11   products for which JDS had no firm orders and could not reasonably expect to sell) grew to such

12   high levels that Defendants knew they could not possibly convert that inventory into sales and such

13   inventory would quickly become obsolete and would have to be written off.

14           (a)     As noted above (¶ 50), Nortel, JDS' largest customer of WDM filters, had a

15   consignment arrangement with JDS whereby Nortel would keep JDS products on its shelf until they

16   were "pulled in" as needed.   According to Confidential Witness No. 9 (a Senior Product Line

17   Manager in Ottawa), Nortel cancelled orders in the Summer of 2000 and JDS' inventory started to

18   build up.  In response, JDS tried to get Nortel to agree to pay for the inventory on their shelves, even

19   though Nortel did not currently need the product.

20           (b)     Confidential Witness No. 49 (a former materials supervisor in San Jose,

21   whose job responsibilities included supervising six stockrooms and an offsite storage facility), also

22   confirmed that there was a buildup of a "huge amount" of excess material throughout 2000.  The

23   massive buildup of inventory, which far exceeded demand, consisted of finished product as well as

24   raw material, mostly raw fiber used in fiber optics.  All six stockrooms were full of inventory by

25   June 2000, and offsite storage areas were used for storing additional inventory.  The stockrooms and

26   storage area combined amounted to approximately 11,000 square feet of storage, and by May or June

27   2000, there was enough raw material and finished fiber optic components to keep the facility running

28

Complaint for Violation of the
Securities Exchange Act of 1934                    - 21 -

1   at capacity for an entire year.  Moreover, Confidential Witness No. 49 stated in the offsite storage

2   facility alone, there were fifty pallets of finished products that no customer had ordered.

3       (c)  This information was confirmed by Confidential Witness No. 50 (a San Jose

4   cost accountant in charge of inventory), who stated that the large build-up of inventory at JDS in

5   2000 was a result of mass cancellations by Nortel and other companies.  According to the

6   accountant, the inventory buildup was out of proportion with the demand for product, and there was

7   a much higher accumulation of both raw material and finished product than there were confirmed

8   orders. Ultimately, in or about March 2001, millions of dollars of the finished product was destroyed

9   as obsolete.

10       (d)  Similarly, Confidential Witness No. 7 (the controller in Horsham), recounted

11   that JDS' inventory of raw material and finished goods was building in the first quarter of 2001 (*i.e.*,

12   quarter ending September 30, 2000) as a result of customer cancellations.

13       61.  As detailed in ¶¶ 171-172, the Company's Oracle system tracked inventory,

14   and reports from the Oracle system indicating excess inventory were provided to each of the

15   Individual Defendants.

16       62.  Nevertheless, despite their knowledge of the inventory build-up in the

17   Company, on October 26, 2000, during an analyst conference call: (i) Defendant Straus specifically

18   represented that JDS was in constant contact with its customers and did not see any inventory

19   buildup at its customers; and (ii) Defendant Abbe confirmed that defendants did not see indications

20   of inventory builds either at JDS' customers or in JDS' own shops.

21       63.  Defendants continued publicly to report JDS' inventory, which was filled with

22   tens of millions of dollars of unsellable products, at full (and thus inflated) values in JDS' quarterly

23   and annual financial statements between mid-2000 and mid-2001.

24       64.  Ultimately, as a result of the long-accumulating increases in excess inventory

25   of which the defendants had long been aware (*see* ¶¶ 47-63, 74-82, 171-182), JDS announced – in

26   July 2001 – that it would have to incur a massive write-down of $270 million in excess inventory

27     **D.**  **Decreasing Demand and Rising Inventories Cause JDS Executives to Begin**
      **Planning During the Summer of 2000 a Major Downsizing**

28

65.     In response to the declining demand and rising inventories, JDS embarked on company-wide cost-cutting strategies such as eliminating shifts, reducing or eliminating overtime and firing temporary workers.  Defendant Straus began planning for a major reduction in JDS' Ottawa facilities, including shutting down 20 buildings.

(a)     Confidential Witness No. 40 (a JDS cleaner in Ottawa), stated that all 40 employees at his particular JDS plant were laid off in March or April 2000, and were told by building manager Dave Baxter that they were being laid off because "business slowed down" and "Nortel wasn't buying anymore." Confidential Witness No. 26 stated that JDS started cutting staff in Ottawa in May or June 2000.

(b)     Confidential Witness No. 27 (a production worker in Bloomfield), and Confidential Witness No. 23 (a Manufacturing Supervisor in Bloomfield) noted that overtime was brought to a halt in mid-2000, and Confidential Witness No. 41 (an Engineering Technician in Bloomfield) stated that a two-shift operation at the plant was reduced to one shift in mid to late 2000.

(c)     By mid to late-2000, according to Confidential Witness No. 25 (a Production Team Leader in Windsor, Connecticut), no overtime was authorized and temporary staff was fired at the Windsor, Connecticut plant.

(d)     Likewise, according to Confidential Witness No. 42, in or around October 2000, middle managers in the E-TEK facility in San Jose told people that JDS was losing business and there were going to be layoffs in manufacturing.

66.     Defendants, no later than the Summer of 2000, had decided that such relatively small measures (e.g., reducing overtime, jettisoning temporary workers) were insufficient, and that what was needed was a fundamental restructuring of the entire business, pursuant to which it would be downsized to better correspond to market reality.  Senior management at JDS, including defendant Straus, began planning for a massive restructuring which was ultimately announced under the name of the "Global Realignment Program" in April 2001.

(a)     JDS' *ad hoc* cost-cutting measures developed into a formal company-wide plan in or around June 2000.  According to Confidential Witness No. 43 (a Facilities Manager for

the entire Ottawa operations), discussions about a wide-scale downsizing began in June 2000. The downsizing was originally termed a "blocking program" and was officially named the Global Realignment Plan in February 2001. Discussions regarding which Ottawa facilities would be shut down began in September 2000, with diagrams showing "who's going, who's coming, and which department is moving where." Initially, the plan was to close 20 buildings. Confidential Witness No. 43 was intimately involved in this diagramming. His colleague, a space planning manager named Albert Corace "would go running back and forth to get" Straus's approval of the plans.

(b)     Confidential Witness No. 16 (a Product Line Manager in Ottawa) confirmed that development of the Global Realignment Plan had started by June 2000.

67.     Despite being in the works for months – including during a time that Defendants repeatedly assured investors about the strength of JDS' business – the Global Realignment Plan was not publicly announced until April 2001.

**E.     By the Summer of 2000, Defendants Were Overstating JDS Uniphase's Assets and Goodwill**

68.     JDS acquired E-TEK on June 30, 2000. At the time, JDS recorded approximately $15.7 billion in goodwill in connection with the acquisition. The $15.7 billion was included on JDS's balance sheet as of June 30, 2000.

69.     Defendants knew or were reckless in not knowing that the goodwill associated with the E-TEK acquisition was impaired from the moment it was recorded and should have disclosed that fact to investors no later than July 2000.

70.     Under GAAP, goodwill is impaired if the amount of goodwill carried on the books exceeds the goodwill's estimated fair value. The fair value of goodwill is measured by determining the present value of future cash flows over the estimated life of the entity to which the goodwill is attributable. Based upon E-TEK's results of operations *before* the downturn in the Spring and Summer of 2000, the present value of its future earnings ranged from a low of $0.79 billion to a high of $5.8 billion, depending upon the period used (*i.e.*, 30 years or 100 years) and the discount and growth rate applied. Thus, even if E-TEK had a useful life of 100 years (far longer than could reasonably be expected), it was clear from the time of the acquisition that JDS had no financial

basis to conclude that $15.7 billion of goodwill would be realized through the future operations of E-TEK.  Once demand slowed down, as described above, it became virtually impossible that JDS would be able to realize E-TEK's goodwill based on the present value of E-TEK's future earnings.

71.     At the very least, defendants should have announced at or about the time the E-TEK deal closed that it was likely they would soon have to write down a significant portion of the goodwill associated with the E-TEK acquisition as a result of: (a) the real value of E-TEK's future earnings; and (b) the material decrease in demand for E-TEK products (as well as JDS' other products) at or about the time of JDS' acquisition of E-TEK.  JDS made just such an announcement with respect to the goodwill of SDL on April 24, 2001.

72.     FAS 121, ¶ 5 provides that an "entity shall review long-lived assets and certain identifiable intangibles to be held and used for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable".  By the end of the first quarter of fiscal 2001 (the quarter ending September 30, 2000), it was clear that demand for both JDS and E-TEK products had dramatically declined.   Thus, pursuant to GAAP, the decline in demand that forced JDS to revise its internal forecasts downward constituted a change in circumstances that required JDS to review its goodwill for impairment.

73.     Regardless, defendants waited until July 2001 to write off approximately $13 billion of the E-TEK goodwill, justifying their delay with an "internal policy" pursuant to which JDS did not assess enterprise-level goodwill for recoverability unless the market capitalization of the Company was less than its net assets.

(a)     Such "internal policy" was inappropriate.  Under GAAP, a change in circumstance with respect to the recoverability of an asset is what should trigger an evaluation of goodwill.  A company's market capitalization, which is merely the price of its stock multiplied by the number of shares outstanding, is wholly irrelevant to a determination to the valuation of goodwill.  Thus, the appropriate trigger point for the write down of goodwill should have been the steep decline in demand that occurred in Summer of 2000, not the decline in the value of JDS' stock in the Winter of 2001.

1           (b)     This inappropriate "internal policy" allowed the Individual Defendants to sell

2   nearly $400 million of their JDS stock at inflated prices between July 31, 2000 and August 31, 2000.

3       **F.    Defendants Continued to Conceal Material Adverse Information Concerning JDS Uniphase's Demand, Inventories, Financial Health and Future Prospects Until After JDS Uniphase Had Completed Its $14 Billion Acquisition of SDL**

4

5           74.     On July 10, 2000, defendants announced that JDS had reached an agreement

6   to acquire SDL.   The acquisition agreement provided for the exchange of 3.8 shares of JDS stock

7   for each share of SDL, and was priced according to the relative trading values between JDS and SDL

8   during a period in June 2000 when JDS' share price was near its all-time high (as a result of artificial

9   inflation caused by defendants' GAAP violations and defendants' concealment of the truth

10  concerning the drop in demand for JDS' products and the rise in JDS' inventory).

11          75.     The SDL acquisition was repeatedly delayed as a result of regulatory issues,

12  and the merger was not put up for a shareholder vote until February 12, 2001.

13          76.     This created a problem for Defendants.  If they disclosed to the public the full

14  extent of the decline in demand for JDS products, or the full truth about the inflated valuations of

15  JDS' inventories, or the looming goodwill issues related to the E-TEK merger, or the fact that

16  defendants were planning a massive downsizing of the entire company,  the SDL deal would be in

17  jeopardy because SDL shareholders would be unlikely to vote in favor of the merger.

18          77.     Therefore, Defendants kept up the appearance that JDS was still experiencing

19  strong demand and bright growth prospects until the merger was approved, and kept silent about the

20  issues of inventory, goodwill and downsizing.  On February 12, 2001, JDS and SDL announced that

21  their respective stockholders approved the merger at special meetings.

22          78.     Immediately following the special meetings, defendants held a conference call

23  in which they provided new and reduced guidance for the combined companies, thereby disclosing

24  the reduced demand that they had long been aware of.  Analysts following JDS felt that they had

25  been duped by the Company's earlier earnings announcements, noting, for example, that "The factors

26  impacting JDSU's business have not changed all that much since we last heard from the company,

27  only the guidance has!"

28

79.     However, the full truth regarding the Company's declining demand and rising inventory at that time was considerably worse, and was only fully disclosed by defendants (together with the company's inventory, goodwill and downsizing issues) much later, in a series of escalating disclosures made between April 24, 2001 and July 26, 2001.

80.     Specifically, on April 24, 2001, defendants disclosed the Global Realignment Program (which they had been planning since mid-2000 – *see* ¶¶ 65-67) and stated that JDS was closing several operations, vacating 25 buildings and laying off approximately 5,000 people, or 20% of its workforce. Defendants also announced an impending and potentially large goodwill write-off, but provided no further specifics regarding the expected or eventual size of the write-off.

81.     Even while revealing negative news, however, defendants continued to conceal the full extent of the Company's problems. Indeed, the Company's April 24, 2001 press release announced earnings that were materially overstated due to the improper recording of $300.9 million paid to SDL executives as merger costs, thereby spreading out the effect of the expense over several years rather than expensing the full amount of the bonuses in the current quarter as required by GAAP.

82.     Finally, on July 26, 2001, defendants revealed that JDS was writing off $38.7 billion of goodwill as of March 31, 2001 and an additional $6.1 billion of goodwill for the quarter ended June 30, 2001, for a total write down of $44.8 billion. The Company also belatedly addressed its excess inventory problem, announcing a huge inventory write down of $270 million.

**DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS BEFORE AND DURING THE CLASS PERIOD**

83.     Defendants, prior to the GOALs offering in March 2001, had been engaged in a long-continuing course of conduct in which they misrepresented JDS' financial results, the state of demand for the JDS' products, JDS' goodwill, JDS' inventory valuations, and the viability of the JDS' basic structure. Defendants also omitted to disclose to investors certain information, concerning these issues, that defendants knew or were reckless in not knowing (*see* ¶¶ 47-82, 171-182). Defendants' misrepresentations and omissions are detailed below.

84. Defendants' continuing misrepresentations and omissions caused JDS' share price to be inflated at the time of the GOALs offering in March 2001. Because the GOALs were structured to be convertible into JDS stock, and because the conversion ratio was fixed based on the price of JDS stock on March 9, 2001 (so that each $1,000 GOAL was convertible into the number of JDS shares that then, as of March 9, 2001, had an aggregate value of $1,000), the GOALs were likewise inflated at the time of their offering.

A. **Pre-Class Period Materially False and Misleading Statements Maintain JDS Uniphase Shares at Inflated Prices**

85. On October 28, 1999, defendants issued a press release announcing JDS' results for the first quarter of fiscal 2000 ( ending September 30, 1999). The press release reported quarterly sales of $230 million, a 20% increase over the prior quarter. On November 4, 1999, defendants filed a Form 10-Q for JDS for the quarterly period ending September 30, 1999 ("First Quarter 2000 10-Q"), signed by defendants Kalkhoven and Muller, and reporting quarterly net sales of $230.1 million.

86. The market responded favorably to JDS' reported sales and earnings, sending the price of JDS stock from $38 on October 28, 1999 to $41 on October 29, 1999 and up to $50 per share by November 12, 1999.

87. The net sales reported in the October 28, 1999 press release and First Quarter 2000 10-Q were intentionally overstated by defendants' fraudulent and fake quarter-ending "shipments" (*see* ¶¶ 54-55) and by defendants' practice of recognizing revenue on shipments to customers such as Lucent and Nortel who were merely holding the JDS products in their inventory and did not have to pay JDS until the product was "pulled down" by the customer (*see* ¶¶ 50-53). According to an October 29, 1999 analyst report by SG Cowen Securities, Lucent and Nortel accounted for 39% of JDS' revenues during the quarter, highlighting the materiality of the Company's transactions with these two customers.

88. On the same date that the First Quarter 2000 10-Q was filed, defendants announced that JDS had agreed to acquire OCLI in a stock transaction valued at $2.8 billion. Defendants would purchase OCLI by exchanging 0.928 JDS shares for each OCLI share.

1    89.    On January 17, 2000, defendants issued a press release announcing the

2   signing of a definitive agreement to acquire E-TEK, a supplier of optical components and

3   component packaging.

4    90.    The market responded to the announcement of the E-TEK merger by driving

5   up the price of JDS stock from $96 on January 14, 2000 (the last trading day prior to the

6   announcement) to $119 three days later.

7    91.    On January 26, 2000, defendants issued a press release announcing JDS'

8   results for the second quarter of fiscal 2000, in which defendants reported quarterly sales of $282

9   million, a 22% increase over sales in the previous quarter.

10    92.    On February 4, 2000, JDS completed the acquisition of OCLI, paying for it

11   with 54 million shares of JDS stock having a total value of $2.7 billion.

12    93.    On February 10, 2000, defendants filed a Form 10-Q for JDS' second fiscal

13   quarter of 2000 (ending December 31, 1999 – the "Second Quarter 2000 10-Q").   The Second

14   Quarter 2000 10-Q, signed by defendants Kalkhoven and Muller, reported quarterly net sales of

15   $281.7 million.

16    94.    The net sales reported in the January 26, 2000 press release and the Second

17   Quarter 2000 10-Q were materially false and misleading for the reasons stated in ¶ 87 above.

18   Lucent accounted for 22% of sales and Nortel accounted for 14% of sales during the quarter, as

19   reported in a January 27, 2000 analyst report by Warburg Dillon Read.

20    95.    On April 25, 2000, defendants issued a press release announcing JDS'

21   financial results for the third quarter of fiscal 2000 (ended March 31, 2000).  Defendants' April 25,

22   2000 press release reported that JDS achieved sales of $394.6 for the quarter, representing 40%

23   growth from the previous quarter.

24    96.    The net sales and sales growth reported in the April 25, 2000 press release

25   were materially false and misleading for the reasons stated in ¶ 87 above.

26    97.    Subsequent to the release of its third quarter results on April 25, 2000,

27   defendants held a conference call to discuss the Company's business and prospects.  During the call,

28

1  defendants Kalkhoven, Muller, Abbe and Straus made presentations and answered questions.

2  During the follow-up conversations with participants, Kalkhoven, Muller, Abbe and Straus directly

3  disseminated important information to the market.  Specifically, Kalkhoven stated that "demand

4  remains incredibly strong", that he believed that "we will see demand accelerate,"  and that

5  "whatever we make is going to be used."  Abbe commented that JDS was seeing an "incredible

6  demand scenario."  Muller added that the Company was seeking to expand capacity to respond to

7  "very strong demand" and Straus stated that the "market" [was] exceeding [the Company's] ability

8  to ramp up."

9          98.     On April 26, 2000, the day after the conference call, securities analysts from

10  J.P. Morgan, Prudential Securities,  Robertson Stephens, SG Cowen Securities, and Warburg Dillon

11  Read issued positive reports on JDS Uniphase, which were based on and repeated statements

12  disseminated by Defendants, including on the quarterly conference call.

13          99.     Defendants' statements on the April 25, 2000 conference call, as reported in

14  the April 26, 2000 analyst reports, were false or misleading when issued.  The true but concealed

15  facts were:

16          (a)     By this time, defendants were seeing clear signs of reduced demand for JDS

17  products company-wide, including loss of business, order cancellations, and refusals of customers

18  to take delivery (*see* ¶¶ 56-57);

19          (b)     Defendants were already reacting to declining demand by implementing cost

20  savings measures such as reducing shifts and eliminating overtime (*see* ¶ 65);

21          (c)     Inventory levels were rising by this time as a result of reduced demand (*see*

22  ¶¶ 56-57).

23          100.    Unaware of the undisclosed negative information, the market responded

24  enthusiastically to defendants' earnings announcement, to defendants' positive  statements about

25  demand and to the positive analyst reports, driving the price of JDS stock from $80 per share the

26  day before the announcement to as high as $104 in the week following the announcement.

27

28

Complaint for Violation of the
Securities Exchange Act of 1934                - 30 -

101.    On May 15, 2000, defendants filed a Form 10Q for JDS for third quarter of fiscal 2000 (the "Third Quarter 2000 10-Q"), signed by defendant Muller, reporting net sales of $394.6 for the quarter.

102.    The Third Quarter 2000 10-Q was false and misleading, for the reasons described above at ¶ 87.

103.    On May 18, 2000, JDS issued a press release announcing that defendant Kalkhoven was retiring as Co-Chairman and CEO and from the Board of Directors. The press release stated that defendant Straus was appointed CEO and would remain Co-Chairman. Further, defendant Abbe was appointed President and Chief Operating Officer and defendant Muller was named Executive Vice President and CFO. The press release further stated that "Mr. Kalkhoven will remain with the Company as an advisor on strategic matters through the end of its fiscal 2001." Kalkhoven was quoted in the press release as stating: "JDS Uniphase is in an outstanding position today from the perspective of our financial performance and strength, our market position, our products and our strategy. . . . The Company is solidly on course. . . ."

104.    Kalkhoven's publicized optimism concerning JDS was, as he would later admit in an interview, exactly the opposite of what he then thought about the Company. In May 2001, the publication *Light Reading* profiled Kalkhoven and noted that he "managed to engineer his departure from JDSU at a choice moment -- a few months before everything optical started going sour (**a development that he says he also saw coming**.)" (Emphasis added). Thus, Kalkhoven has admitted that he knew in May 2000 that business was slowing down and was about to go "sour."

105.    Kalkhoven remained an employee of JDS through July 31, 2001. In fact, according to Confidential Witness No. 8, an Executive Assistant in JDS' executive suite in San Jose whose desk was located outside of Kalkhoven's office, Kalkhoven retained his office and computer and came to the office even after his announced retirement. Kalkhoven's insider sales in August 2000 and February 2001 were made as an insider, and after he was provided access to the Oracle System's non-public information regarding demand, sales and inventory.

1        106.    Defendants' acquisition of E-TEK was completed on June 30, 2000 for 150.1

2    million shares of JDS stock – i.e., a total purchase price of $17.5 billion.

3        107.    On July 10, 2000, defendants announced that JDS had agreed to merge with

4    SDL, a fiber optic communications company, in a transaction (then) valued at approximately $35

5    billion.  The merger was JDS' largest acquisition to date.  The merger agreement provided for the

6    exchange of 3.8 shares of JDS stock for each share of SDL.

7        108.    On July 26, 2000, defendants announced JDS' financial results for the fourth

8    quarter of fiscal 2000, reporting quarterly net sales of $524 million, or 33% above net sales of $395

9    million for the previous quarter.

10        109.    The net sales and growth figures reported by defendants in the July 26, 2000

11    press release was false and misleading for the reasons described above at ¶ 87.

12        110.    On July 26, 2000, defendants held a conference call to discuss the Company's

13    fourth quarter 2000 results, its business and prospects.  During the call, Defendants Straus, Muller

14    and Abbe made presentations and answered questions.  Muller falsely stated that "demand for our

15    products remains very strong and our growth remains determined by the rate at which we can

16    expand capacity" and Straus added that the "demand for bandwidth" is "grow[ing] exponentially."

17        111.    Muller also admitted during the July 26, 2000 conference call that the

18    financial reporting and forecasting components of JDS' module system were available to "all parts

19    of the Company."

20        112.    Following the conference call, on July 27, 2000, securities analysts from

21    Credit Suisse First Boston and WR Hambrecht & Co. issued positive reports on JDS and the

22    purported strong demand for its products, which were based on, and repeated, statements

23    disseminated by defendants, including on the quarterly conference call.

24        113.    The above-referenced statements by the Individual Defendants on the July

25    26, 2000 conference call, and as reported in the above-mentioned analyst reports, were false or

26    misleading when issued. The true but concealed facts were:

27

28

1         (a)     Demand for JDS products had dropped off dramatically by June 30, 2000 as

2 fewer and fewer orders were coming in, some orders were cancelled and customers were declining

3 to take delivery of products they had previously ordered (*see* ¶¶ 56-58);

4         (b)     By no later than the Spring of 2000, and in response to reduced demand, JDS

5 was implementing cost savings measures such as reducing shifts, eliminating overtime and reducing

6 production days at its manufacturing plants and, indeed, by Summer of 2000 was already planning

7 for a major restructuring (*see* ¶¶ 65-66); and

8         (c)     Inventory levels were starting to rise as early as the Spring of 2000 as a result

9 of reduced demand (*see* ¶¶ 56-58).

10         114.    In the weeks following the release of the Company's results for fiscal 2000,

11 the Individual Defendants and other high ranking JDS insiders engaged in concerted and

12 concentrated insider selling. Of the $700 million of JDS stock sold by insiders during 2000 and the

13 first half of 2001, $500 million was sold between July 31, 2000 and August 31, 2000 when the

14 closing price of JDS stock ranged between $112 and $125, near its all-time high.

15         115.    On August 18, 2000, Thomas Pitre memorialized in an internal JDS e-mail

16 (*see* ¶¶ 175-182) that demand had dropped off in "recent weeks" and that JDS was *internally*

17 revising downward its forecasts. In fact, the drop off in demand had already been known by JDS

18 management for months as a result of their access to Oracle System reports (*see* ¶¶ 171-172).

19         116.    On September 1, 2000, JDS filed a Form 8-K with the SEC which contained

20 the Company's fiscal 2000 financial statements (the "September 1, 2000 8-K"). The financial

21 statements represented that net sales for the year were $1.4 billion. This figure was materially false

22 and misleading for the reasons described above at ¶ 87.

23         117.    The September 1, 2000 8-K also disclosed that JDS' inventories balance at

24 June 30, 2000 was $375.4 million -- an increase of $94.7 million over its inventories balance at

25 March 31, 2000. The September 1, 2000 8-K attributed the 34% increase in inventories to the

26 "ongoing increases in demand for nearly all of our component and module products."

27

28

118.    The inventories balance reported by defendants in JDS' fiscal 2000 financial statements was materially overstated as it included a substantial amount of excess inventory that defendants knew or should have known JDS would not be able to sell.  Indeed, as detailed above at ¶¶ 56-58, inventory was then building up -- and that fact, combined with the reduction in demand, meant that JDS Uniphase could not reasonably expect to sell such inventory.  Pursuant to GAAP, ARB, Chapter 4, Section 5, and according to the Company's own policy as described below, the excess inventory should have been written off starting in June 2000 and in each successive quarter as excess inventory continued to build and it was clear that such inventory was obsolete and no longer worth the amount at which it was being carried on JDS' books.  However, defendants failed to write down JDS' inventory until the fourth quarter of fiscal 2001.

119.    Moreover, defendants' representation in the September 1, 2000 8-K about the rise in inventories being attributable to increases in demand was also false and misleading.  As detailed above at ¶¶ 56-58, inventory had increased due to *decreased* demand and inability to ship products to customers and, specifically, due to Nortel's and Lucent's declining to accept orders in April 2000 which resulted in $40 million in excess inventory (*see* ¶ 56f).  Thus, at least 42% of the total increase in inventory for the quarter was due to the rejection of orders, which is directly contrary to defendants' contemporary representation.

120.    The September 1, 2000 8-K also represented that as of June 30, 2000, intangible assets were $22.3 billion, including goodwill of $21.3 billion.  That balance included $15.7 billion of goodwill attributable to the June 2000 E-TEK acquisition.  As detailed above at ¶¶ 68-72, defendants had no basis to conclude that JDS would be able to realize the value attributed to E-TEK's goodwill through future operations, especially in light of the decrease in demand that had already been observed at that point.  Accordingly, defendants knew or were reckless in not knowing that JDS would have to write off billions of dollars of that goodwill in the near future and failed to disclose that fact.  Defendants first alerted investors to a potential multi-billion dollar write off in April 2001, and only concretely disclosed the ultimate amount of the write-off (approximately

1    $44 billion in all) in July 2001, approximately $13 billion of which was goodwill attributable to the

2    E-TEK acquisition.

3            121.    On September 28, 2000, defendants filed JDS' Annual Report on Form 10-K

4    with the SEC for the fiscal year ended June 30, 2000 (the " 2000 10-K").  The 2000 10-K

5    incorporated by reference the financial statements filed with the SEC in the September 1, 2000 8-K.

6    The 2000 10-K was signed by defendants Straus and Muller and was false and misleading for the

7    same reasons that the September 1, 2000 8-K was false and misleading as described in ¶¶ 118-120.

8            122.    On October 10, 2000, Lucent, one of JDS' two biggest customers, announced

9    in a press release that it was experiencing a slow down in its optical networking business.  On

10   October 25, 2000, Nortel reported its results for the quarter ending September 30, 2000 and noted

11   that it was experiencing a downturn in its optical networking equipment division -- the division

12   which made Nortel the other of JDS' two largest customers.

13           123.    Concerned that Nortel's business woes might mean trouble for JDS ,

14   investors drove down the price of JDS stock 21%, to $75.  As discussed below at ¶¶ 126-134,

15   defendants promptly responded by explicitly and falsely denying that there was a problem.

16           124.    On October 26, 2000, defendants issued a press release announcing JDS'

17   financial results for the first quarter of fiscal 2001, reporting that quarterly net sales had risen 23%

18   from the previous quarter to $786 million.

19           125.    The net sales as reported in the October 26, 2000 press release were

20   materially overstated, because defendants improperly recognized revenue on shipments to

21   customers such as Lucent and Nortel who were merely holding the JDS products in their inventory

22   and did not have to pay JDS until they "pulled down" the product (see ¶¶ 50-53).

23           126.    Subsequent to the release of JDS' fiscal 2001 first quarter results, on October

24   26, 2000, defendants held a conference call to discuss the Company's business and its prospects.

25   During the call, Straus, Muller and Abbe made presentations and answered questions in response

26   to analysts' concerns regarding a recent significant drop in JDS' stock price.  Straus, Muller and

27

28

Abbe represented that business at JDS was extremely strong, there was no drop in demand or build-up of inventory, and that the Company was increasing its revenue guidance going forward.

127.   Specifically, Abbe made the following representations on the October 26, 2000 conference call:

"We do not see indications of systematic across the board component or module inventory builds either at our customers or in our own shops;"

"We do not see double bookings nor do we see systematic trends in changes in the size of orders and/or forecasts being shared with us by our customers;"

"We do not see any systematic stretch out of delivery dates for orders already placed;"

"Customer orders for our products are keeping up with our output;"
"In total, we believe demand remains strong."

128.   In addition, Straus made the following representations on the October 26, 2000 conference call:

the industry outlook was that "demand is strong and will continue to grow;"

JDS was in constant contact with its customers and did "not see any inventory buildup at customers;" and

"demand continues to be strong."

129.   Muller added on the conference call that JDS was *increasing* its guidance for fiscal 2001 from $0.70 to $0.80 and was expecting an additional $0.02 to $0.03 more than what had previously been projected for the second quarter of fiscal 2001.  Muller also stated that JDS spent a substantial amount of time with its customers, that JDS had visibility into the customer needs, and that JDS was "still capacity constrained."

130.   As described in a November 1, 2000 *Motley Fool* article recounting the October 26, 2000 conference call, "[i]t's rare that I've listened to any conference call in which I've heard so many comments from management about how good things went in the past quarter and how good they expect business to be in the future."

131.   Following the conference call, on October 27, 2000, securities analysts issued reports on JDS based on, and repeating, statements disseminated by defendants, including those made on the quarterly conference call and especially those concerning inventory, as follows:

JP Morgan:

**The company is seeing tremendous growth from many systems suppliers, not just Nortel, Alcatel, and Lucent... Key to helping calm fears is management's guidance for revenue growth into 2Q/01 and the remainder of fiscal 2001** (ended in June). Previous guidance called for 90% revenue growth in 2001, which was raised to 115-120%, a range which we believe may still be conservative.

Important points from the call:
*       Strong Customer Relationships and Markets-Management provided greater insight on the call regarding how its 80 sales engineers worldwide keep constant tabs on customers and their inventory levels. **In particular, JDS management emphasized that it has seen 1) no systematic inventory builds at its customers, 2) no double booking, 3) no change in order size beyond general increases with demand, and 4) no stretching of delivery schedules**. Lead times have also not changed for the company as demand continues to keep pace with JDS's output growth . . .  (Emphasis added).

CIBC World Markets Corp.:

**Management, through extensive customer discussions, indicated that [they] do not see any demand slowdown, inventory buildup or shortening lead times for its optical components and subsystems.**  While some skeptics will remain, management has not seen any change in spending forecasts from customers.
*       *       *
We are raising our revenue forecast in FY2001 to $3.9 billion, up from our previous $3.3 billion estimate, after CFO Tony Muller guided for 115%-120% year/year growth.  (Emphasis added).

Credit Suisse First Boston:

Despite the negative results delivered by Nortel and Lucent in the September quarter which shook the optical systems and component industry, JDS delivered another outstanding quarter based upon all financial metrics... **[T]he tone of the conference call was extremely upbeat reflecting strong demand for the company's broad array of both active and passive components and modules. JDS management was emphatic that there was no systematic component/module overbuild occurring or significant component/module inventory increases with customers**.  (Emphasis added).

SG Cowen Securities:

Importantly, management's tone was very confident on last night's conference call and its outlook was very bullish.  **On the call, management was emphatic that they are not seeing any downshift in demand for optical systems or components. In addition, the company indicated that it saw no evidence of "a systemic build-up of inventories" among its customers, no delay in the delivery times of existing orders and no evidence of double ordering among the carriers. The company backed its argument by pointing out that it is in constant contact with its customers in order to maintain a good understanding of their short and long-term component requirements**.  While the question remains as to how carrier spending will trend next year, JDS remains firm in its belief that demand for optical networking systems and components will remain very strong for the foreseeable future. (Emphasis added).

William Blair & Co.:

**Realizing the concerns among investors, management indicated that it is seeing no evidence of inventory buildup at customers, no evidence of double bookings, no change in the size of orders placed by customers, and no evidence that scheduled delivery dates are being extended.  Most importantly, demand remains very strong**. (Emphasis added).

Robertson Stephens:

With regards to inventory, JDS Uniphase addressed concerns about inventory building at the system level. **JDS Uniphase remained firm that it is not seeing any inventory build-up of its product at its customers.** (Emphasis added).

132.   An October 27, 2000 *Wall Street Journal* article about JDS' first quarter 2001 results highlighted JDS executives' surprisingly positive statements about the demand for JDS' products, stating that JDS:

sought to calm nervous investors with strong fiscal first-quarter results and equally bullish statements about its outlook for fiber-optics communications gear.

Just two days after Nortel Networks Corp. stunned financial markets by reporting slower sales of fiber-optics equipment, JDS officials said they see no letup in the fevered demand for JDS components, which are used by Nortel and others.  "We had a great quarter," JDS Chief Executive Jozef Straus told Wall Street analysts at the start of a conference call.  "Our outlook and guidance for the next quarter and year are equally strong."

Repeatedly and at great length, JDS executives went out of their way to ease fears that JDS wouldn't be able to meet targets for explosive growth. **President Charles J. "Jay" Abbe said the company had extensively surveyed its customers and found no indication of growing inventories, phantom orders or slowing forecasts.  "We cannot see and do not find meaningful evidence of an industry slowdown," Mr. Abbe said.**

The bullish comments, and JDS's better-than-expected results, seemed to have their intended effect.  JDS shares rose sharply during after-hours trading to $82.44 each, after climbing $3.44 to $74.44 each at 4 p.m. in Nasdaq Stock Market trading.  In all, the stock recovered nearly half the $24 it had surrendered Wednesday.  JDS was the most actively traded issue on Nasdaq yesterday. . . .

**Mr. Abbe said demand for JDS's amplifiers, filters and other products continues to outstrip the company's manufacturing capacity**, meaning slowdowns of some customers' orders are being offset by demand from others.

Chief Financial Officer Anthony Muller urged analysts to increase their revenue and earnings estimates for JDS in its current fiscal year, which ends June 30. Mr. Muller said JDS expects to earn 80 cents a share this year, almost 15% more than the 70-cent consensus estimate of analysts surveyed by First Call/Thomson Financial.

JDS now expects sales to more than double this year, revising its growth projection to 115% to 120% from a 90% estimate in July, Mr. Muller said. . . .

There were no hints of an industry slowdown elsewhere in JDS' financial statements. Inventories grew only 5% from the previous quarter, much slower than sales. And accounts receivable kept pace with sales, suggesting that JDS' customers weren't hoarding equipment or having trouble paying their bills. . . . (Emphasis added).

133.    Defendants' October 26, 2000 earnings announcement, and the October 27, 2000 analyst reports and media reports based on defendants' statements, reassured a skittish market that had driven the price of JDS stock down based on the news emanating from Lucent and Nortel. Thus, the price of JDS stock rose from $74 on October 26, 2000 to $77 on October 27, 2000 and up to $81 by October 31, 2000.

134.    Defendants' representations as reported in the foregoing analyst reports and in the October 27, 2000 *Wall Street Journal* were false and misleading when issued. The true but concealed facts were:

(a)    Demand for JDS Uniphase products had dropped off dramatically by the Summer of 2000 and such decline continued into the Fall as fewer and fewer orders were coming in, orders were being reduced or cancelled, deliveries were being deferred, customers were declining to take delivery of products they had previously ordered, and customers were returning product they could not move off their own shelves (*see* ¶¶ 56-62);

(b)    In direct contradiction to Abbe's statement that "We cannot see and do not find meaningful evidence of an industry slowdown**"** as a result of the decreased demand, JDS had in fact *internally* revised its sales forecasts downward by no later than August 2000, as reflected in the Pitre e-mail (*see* ¶¶ 175-182);

(c)    Contrary to defendants' representations, customer inventory levels were indeed building, including Nortel's and Lucent's inventory,  which prompted Lucent to ask JDS to hold some of its inventory in the Spring of 2000 (*see* ¶¶ 56-62); and

(d)    By no later than the Spring, and continuing into the Fall of 2000, defendants were implementing cost savings measures such as reducing shifts, eliminating overtime and

1   reducing production days at JDS plants, and by June 2000 had already began planning a major

2   restructuring with the involvement of defendant Straus (*see* ¶¶ 65-67).

3         135.   On or about November 13, 2000, defendants filed a Form 10-Q with the SEC

4   which contained JDS' financial statements for the first quarter of fiscal 2001 (the "First Quarter

5   2001 10-Q"). The First Quarter 2001 10-Q, signed by Defendant Muller, reiterated the Company's

6   results as announced in its October 26, 2000 press release, including sales of $786.5 million and

7   also represented that its inventories at September 30, 2000 were $394.5 million and its goodwill

8   was $21.3 billion. The First Quarter 2001 10-Q also stated that "[s]trong demand for virtually all

9   our optical components and modules products combined with the increased operations resulting

10   from our acquisitions completed in fiscal 2000 contributed to the increases in gross profit."

11         136.   The First Quarter 2001 10-Q was false and misleading. First, JDS' sales

12   were overstated for the reasons detailed above at ¶ 125. Second, contrary to the representation

13   concerning strong demand, demand had in fact declined dramatically months earlier, forcing JDS

14   to revise its internal sales forecasts downward (*see* ¶¶ 175-182). Third, the inventories balance

15   reported in the First Quarter 2001 10-Q was overstated in violation of GAAP due to the

16   accumulation of excess inventory (*see* ¶¶ 56-64). Finally, JDS' goodwill balance was materially

17   overstated due to the overvaluation of the goodwill attributable to the E-TEK acquisition (*see* ¶¶

18   68-73).

19         137.   On November 20, 2000, JDS and SDL set December 27, 2000 as the date for

20   their shareholders to vote on the proposed merger at special meetings of their shareholders. On

21   December 18, 2000, JDS and SDL were forced to adjourn the December 27, 2000 meetings because

22   of delays in the regulatory approval process. On December 28, 2000, JDS and SDL set January

23   26, 2001 as the new date for the shareholders' meetings. On January 24, 2001, the meetings were

24   adjourned to February 12, 2001.

25         138.   On January 25, 2001, defendants issued a press release announcing JDS'

26   financial results for the second quarter of fiscal 2001, reporting quarterly sales of $925 million,

27   compared to $786 million for the previous quarter.

28

1    139.    In addition to reporting the Company's historical results, the January 25,

2    2001 press release also contained defendants' first acknowledgment that demand for JDS' products,

3    and JDS' prospects, were not as positive as had been portrayed:

4       JDS Uniphase expects sales in the March quarter to be 7% to 10% above sales for
        the quarter ended December 30, 2000.  This change in guidance from previous
5       periods reflects uncertain carrier capital spending prospects, customer inventory
        adjustments, and a somewhat lower level of near-term sales visibility than the
6       Company has experienced in recent periods.  The Company anticipates sales for its
        fiscal year ending June 30, 2001 to be in the range of previously announced
7       guidance of 115% to 120% above pro forma combined sales for the fiscal year
        ended June 30, 2000, recognizing that it could be at the low end of that range. . . .
8       The Company expects pro forma earnings per share in its third quarter to be
        approximately equal to or slightly above the December quarter [$0.21] and to be
9       approximately $0.82 for the fiscal year ending June 30, 2001.

10    140.    As in past quarters, the quarterly sales reported by defendants were

11    overstated, for the reasons stated in ¶ 125.

12    141.    Furthermore, notwithstanding that the Company finally alluded, in the

13    January 25, 2001 press release, to the fact that demand was not quite as good as defendants had

14    primed the market to believe, defendants continued to downplay the effect that this would have on

15    JDS' future results and suggested instead that the downturn in demand would have only a minor

16    and temporary effect on JDS.  This is illustrated by an article in *The Wall Street Journal* on January

17    26, 2001, which stated, in relevant part:

18       **Despite the more conservative outlook, JDS executives were generally bullish
         in a conference call with Wall Street analysts.**  "We have had a great quarter, and
19       we look to the future with considerable optimism," said Chief Executive Officer
         Jozef Straus."
20
21       President Charles J. Abbe said the lower growth forecast primarily reflected efforts
         by JDS's customers to reduce inventories of fiber-optic parts.  Both Nortel Networks
22       Corp. and Lucent Technologies Inc., JDS's two biggest customers have recently
         announced plans to trim inventories as their own sales of fiber-optic gear slow.
23       (Emphasis added).

24    142.    In conjunction with the release of its financial results for the second quarter

25    of fiscal 2001, and as referred to in the January 26, 2001 *Wall Street Journal* article, defendants held

26    a conference call on January 25, 2001 to discuss the Company's business and prospects.  During

27    the call, Straus, Muller and Abbe made presentations and answered questions.  Abbe stated that

28    despite the inventory adjustments at JDS' customers, "demand is so strong," "backlog is

Complaint for Violation of the
Securities Exchange Act of 1934          - 41 -

enormous," "we do not see oversupply," and the "underlying growth in telecommunications bandwidth we believe continues unabated." Muller took these positive sentiments a step further and actually increased fiscal year 2001 estimates to $0.82 per share, which he said were "slightly above consensus estimates prior to this call."

143. Following the conference call, on January 26, 2001, securities analysts from CIBC World Markets, Credit Suisse First Boston, J.P. Morgan, and SG Cowen Securities issued positive reports on JDS stating that the long-term outlook for the company remained extremely strong, which reports were based on and repeated information provided by JDS management on the conference call and in follow-up conversations.

144. Each of the above–referenced statements made by defendants on the January 25, 2001 conference call as reported in the January 26, 2001 analyst reports and *The Wall Street Journal* article was false or misleading when issued. Despite defendants' representations about continued strength in demand, the true but concealed facts were:

(a) Demand for JDS products had dropped off dramatically by the Summer of 2000 and got worse throughout the remainder of calendar year 2000 as fewer and fewer orders were coming in, orders were being reduced or cancelled, deliveries were being deferred, customers were declining to take delivery of products they had previously ordered, and customers were returning product they could not move off of their own shelves (*see* ¶¶ 56-60);

(b) As a result of this decreased demand, JDS revised its *internal* sales forecasts downward by no later than August 2000, as reflected in the Pitre e-mail (*see* ¶¶ 175-182); and

(c) In reaction to this decreased demand, by no later than the Spring of 2000 defendants were implementing cost savings measures such as reducing shifts, eliminating overtime and reducing production days at JDS plants and by June 2000 had already began planning a major restructuring with the active involvement of defendant Straus (*see* ¶¶ 65-67).

**B. Shortly Prior to the March 2001 GOALs Offering, Defendants Admit That Business Is Slowing, But Continue to Misrepresent the Company's Financial Results, Inventory, Goodwill, and Operational Viability**

145.    On February 12, 2001, JDS and SDL announced that their respective stockholders approved the merger at special meetings.    JDS completed the SDL merger on February 13, 2001, exchanging 3.8 shares of JDS stock  for each outstanding share of SDL stock. Acquiring SDL cost defendants a total of 334 million shares of JDS stock, which at the time of the announcement of the acquisition (June 2000) were valued at $35 billion, and which at the time of the completion of the acquisition (February 2001) were valued at $14 billion.

146.    On February 13, 2001 – i.e., immediately after defendants' completion of the $14 billion SDL acquisition – defendants issued a press release announcing reduced guidance for the third quarter of fiscal 2001 (ending March 31, 2001) from $0.21 to $0.17 and reduced earnings estimates for fiscal 2001 from $0.82 to $0.74.  The February 13, 2001 press release stated, in relevant part:

> The Company expects sales in the quarter ending March 31 to be at or slightly above $1 billion with earnings per share of $0.17. . . .  In addition, this guidance reflects continued uncertainty in carrier capital spending prospects and customer inventory adjustments as well as a lower level of near-term sales visibility than the Company has experienced in recent periods.  The Company anticipates sales for its fiscal year ending June 30, 2001 to be $3.9 billion with earnings per share of $0.74.

147.    In conjunction with their February 13, 2001 press release, defendants held a conference call during which they provided new and reduced guidance for the combined companies.  During the call, Muller stated that he thought that the customer inventory adjustments would remain for only one or two quarters, that the "long term outlook is good" and that "demand is projected to continue to grow."

148.    The analysts on the call were astounded by the lower forecasts and wrote the following about the February 13, 2001 conference call:

First Union Securities:

> *        Last night, JDSU provided new guidance for the business model arising from the closing  of the merger with SDLI and reduced visibility since the company reported earnings.
> *        Clearly, it is not pleasant to be hit with an additional estimate reduction only three weeks after a similar action on JDSU's most recent quarterly earnings call. The company provided no hard information to explain the reduced visibility, only that the outlook had mildly deteriorated in recent weeks.  This move serves to undermine our confidence. . . .

SG Cowen Securities:

[T]he company took this opportunity to lower its guidance on the current quarter as well as fiscal 2001.  The company also provided preliminary guidance on 2002, which was well below the current Street's consensus of $1.12 in EPS on $5.72 billion in sales.  In our view, this change in the company's guidance was surprisingly weak, particularly in light of the fact that it just provided fresh guidance a couple of weeks ago when the company reported its fiscal 2Q:F01 numbers in late January.  This change in the numbers, together with the change in management's tone, was sobering to say the least.

\*      \*      \*

[I]n our view, the major issues with these numbers is the lower revenue guidance.  It's clear from this guidance that the growth outlook at both JDSU and SDLI has worsened significantly!

JDSU's business environment is characterized by low visibility, weakening demand and, we believe, falling prices.  **The factors impacting JDSU's business have not changed all that much since we last heard from the company, only the guidance has!**  (Emphasis added).

149.   Defendants filed a Form 10-Q for the second quarter of fiscal 2001 with the SEC on February 13, 2001 (the "Second Quarter 2001 10-Q"), which was signed by Defendant Muller.  The Second Quarter 2001 10-Q repeated the quarterly results first disclosed in defendants' January 25, 2001 press release, including:  quarterly sales of $925.1 million; an inventories balance at December 30, 2000 of $493.9 million; and goodwill of $21.2 billion.  In addition, the Second Quarter 2001 10-Q stated that "Strong demand for virtually all our optical components and modules products combined with the increased operations resulting from our acquisitions completed subsequent to December 31, 1999 contributed to the increases in gross profit."

150.   The Second Quarter 2001 10-Q was false and misleading, because:

(a)     Sales were overstated for the reasons described in ¶ 125;

(b)     References in the Second Quarter 2001 10-Q to "strong demand" were contradicted by the internally-known and internally-acknowledged downturn in demand at the Company as described in ¶ 144(a);

(c)     JDS' inventories balance was overstated due to the accumulation of significant amounts of excess inventory that JDS could not reasonably have expected to sell (*see* ¶¶ 56-64, 202-204).  At the end of the Class Period, a substantial amount of inventory that was on the books as of December 30, 2000 was written off.  Under GAAP, and according to the Company's own policy as described below (*see* ¶¶ 202-204), the excess inventory should have been written off

in the quarter in which its market price fell below cost (*i.e.*, the quarter ending June 30, 2000 and each successive quarter in which excess inventory continued to build); and

(d)     JDS' goodwill balance was also overstated as a result of including goodwill related to the E-TEK acquisition (*see* ¶¶ 68-73).

151.     On March 6, 2001, the Company filed a Form 8-K with the SEC in which it revised its guidance for future periods slightly downwards:

> [JDS] expects sales in its third quarter ending March 31, 2001 to be approximately $925 million [down from the $1 billion announced on February 13, 2001] with pro forma earnings per share of approximately $0.14.  Fourth quarter guidance (for the quarter ending June 30, 2001) now is for sales and pro forma earnings per share to be approximately at the same levels as the third quarter or slightly above those levels.  [JDS] has not provided guidance for the fiscal year ending June 30, 2002.  JDS's revised guidance, which is lower than guidance previously provided for the periods, reflects continued uncertainty in carrier capital spending prospects and customer inventory adjustments as well as a lower level of near-term sales visibility than [JDS] has experienced in recent periods.

152.     None of defendants' guidance reductions between January 25, 2001 and March 6, 2001 gave any indication that: (i) the Company was carrying excess/obsolete inventory as a result of reduced demand; (ii) that the Company would have to write off more than a quarter of a billion dollars of inventory it was then carrying on its books and which should have been written off in prior quarters; (iii) that the Company would soon be writing off almost all of the goodwill recorded in connection with the E-TEK acquisition; or (iv) that the Company had determined that it had overcapacity in light of the demand context and thus that the Company would require large-scale downsizing.

153.     On or about March 8, 2001, $51 million in face value of GOALs were offered to the public.  On March 12, 2001, the GOALs began trading on the American Stock Exchange under the symbol "NYJ.A".  As explained above (*see* ¶¶ 33-46), each $1,000 GOAL, upon redemption, could be converted into 35.5556 shares of JDS stock.  This conversion ratio was set using JDS' then-current March 9, 2001 closing price of $28.125 – 35.5556 shares at $28.125 per share are worth $1,000).  The conversion ratio thus incorporated JDS' price inflation, based upon the misrepresentations and omissions detailed above, into the value of the GOALs.

**C.    After the GOALs Offering, the Truth Concerning JDS Uniphase's Inflated Goodwill, Inventory, and Business Structure Begins to be Disclosed**

154.    On April 24, 2001, defendants issued a press release announcing JDS' financial results for the third quarter of fiscal 2001.   The Company reported sales of $920 million for the quarter and represented that its actual (as opposed to pro forma) net loss for the quarter was $1.293 billion.

155.    The sales reported in the April 24, 2001 press release were inflated, for the reasons stated in ¶ 125.

156.    In the same press release, defendants disclosed to the public for the first time: (i) defendants' "new" Global Realignment program in response to declining demand (*i.e.*, the restructuring program that defendants had been planning since June 2000 – *see* ¶¶ 65-67); and (ii) that the Company's goodwill was impaired.   The press release stated in pertinent part:

> The Global Realignment Program is intended to align the Company's resources and operations into a global structure that is competitive now and positions the Company to remain competitive in the future.  **This program includes a number of actions by the Company to reduce costs and expenses and align manufacturing capacity with customer demand.  The Company will close several operations, vacate 25 buildings at operations to be closed, as well as at continuing operations, and reduce employment by approximately 5,000 people or 20% of current levels.  These actions are being taken in response to current business conditions** in a market the Company continues to believe will experience substantial growth over the longer term.   The Company believes these changes will position JDS well in the current business environment and prepare it for future growth with increasingly competitive new product offerings and long-term cost structure.
> *       *       *
> Sales for the third quarter ended March 31, 2001 were 1% below sales of $925 million for the quarter ended December 30, 2000 and 90% above pro forma combined sales of $485 million for the quarter ended March 31, 2000...
> *       *       *
> The Company is evaluating the carrying value of certain long-lived assets, consisting primarily of $56.2 billion of goodwill recorded on its balance sheet at March 31, 2001.   Pursuant to accounting rules, the majority of the goodwill was recorded based on stock prices at the time merger agreements were executed and announced.   The Company's policy is to assess enterprise level goodwill if the market capitalization of the Company is less than its net assets.   Goodwill will be reduced to the extent that net assets are greater than market capitalization.   At March 31, 2001, the value of the Company's net assets, including unamortized goodwill exceeded the Company's market capitalization by approximately $40 billion.
>
> The Company anticipates sales and pro forma earnings per share for its fourth quarter ending June 30, 2001 will be approximately $700 million and $0.05, respectively. . .

157.   Defendants had long been aware (*see* ¶¶ 65-73) that JDS required severe downsizing and massive goodwill write-offs.  The market, however, was sharply surprised by these announcements and their magnitude.  JDS stock fell approximately 14% (from $24.18 on April 23, 2001 to $20.82 on April 24, 2001), and the GOALs likewise fell 8.5% (from 94.75% of par value on April 23, 2001 to 86.75% of par value on April 26, 2001).

158.   On May 10, 2001, defendants filed with the SEC a Form 10-Q for the third quarter of fiscal 2001 (the "Third Quarter 2001 10-Q"), signed by defendant Muller.  The Third Quarter 2001 10-Q repeated the results first announced in defendants' April 24, 2001 press release, including sales of $920.1 million and a net loss of $1.29 billion.  The Third Quarter 2001 10-Q further represented that JDS' inventories balance at March 31, 2001 was $672.9 million, a 36% increase over the inventories reported on JDS' balance sheet at the end of the prior quarter.

159.   The Third Quarter 2001 10-Q was false and misleading, because:

(a)   Reported net sales were overstated, for the reasons stated in ¶ 125.

(b)   Reported inventory value was overstated, because excess inventory had risen so high that the Company could not reasonably expect to sell the inventory before it turned obsolete (*see* ¶¶ 56-64, 203-204).  At the end of the Class Period, approximately $270 million of inventory that was on the books as of March 31, 2001 was written off.

160.   In addition, the financial results reported in the April 24, 2001 press release and Third Quarter 2001 10-Q were also false and misleading, and required restatement.  On September 19, 2001 defendants filed an Amended 10-Q for third quarter of fiscal 2001 with restated results (the "Amended Third Quarter 2001 10-Q").  The Amended Third Quarter 2001 10-Q disclosed for the first time that the Company had improperly recorded $300.9 million paid to certain SDL executives in connection with JDS' acquisition of SDL as acquisition costs (which would have been amortized over five years) instead of as compensation expenses for the quarter as required under GAAP.  Thus, instead of losing $1.29 billion for third quarter of fiscal 2001 as originally reported, the Company actually lost $41.84 billion (due in large part to the Company's improper

recording of acquisition costs and its enormous goodwill write-down of $38.7 billion), as conceded by defendants in the Amended Third Quarter 2001 10-Q.

161.    On June 12, 2001, JDS issued a press release announcing the retirement of Charles Abbe as President and Chief Operating Officer.

162.    On June 14, 2001, defendants issued a press release reducing financial guidance yet again, and disclosing publicly for the first time the fact that JDS' inventories balance was overstated due to declining demand.  The June 14, 2001 release stated, in relevant part:

> The Company anticipates sales for its fourth quarter ending June 30, 2001 will be approximately $600 million as compared to earlier guidance of $700 million [and initial guidance of $1 billion].  This revised outlook reflects continued weakness in telecommunications carrier spending and inventory reductions by the Company's system provider customers.

> JDS Uniphase anticipates sales of $450 million for its first quarter of fiscal 2002 ending September 29, 2001.  The Company is carefully reviewing its expense structure in connection with the preparation of its fiscal 2002 operating plan to determine the changes, including additional charges under the Company's previously announced Global Realignment Plan, required to respond to this revised sales forecast.  The Company is not providing guidance for later periods at this time.

> **The lowered sales forecast will cause the Company to record inventory write-downs in its fourth quarter ending June 30, 2001.  The Company reserves inventory amounts for specific components and modules with on hand balances in excess of six months' supply, and the lowered forecast will require an increase in excess inventory reserves of $225 to $250 million.**  The inventory write-downs are expected to result in a fourth quarter pro forma loss of $0.06 to $0.08 per share after exclusion of merger & acquisition related charges and charges resulting from the Company's Global Realignment Program.  Absent the inventory write-downs, the Company anticipates such pro forma results would be profitable. (Emphasis added).

163.    In response to these guidance reductions and inventory warnings, JDS stock fell 9% (from $13.81 on June 14, 2001 to close on June 15, 2001 at $12.44 per share), while the GOALs likewise fell 8.7% (from 86.5% of par value on June 14, 2001 to 79% of par value on June 15, 2001).

**D.    The Full Extent of the Bad News Is Finally Disclosed**

164.    On July 26, 2001, defendants issued a press release announcing financial results for the fourth quarter of fiscal 2001.  Quarterly sales were a shocking 35% *below* those reported for the previous quarter.  In addition to the dismal fourth quarter results, the Company also

finally and publicly quantified (at staggeringly high sums) the write-downs of inventory and goodwill that they had referred to more vaguely in public statements during the preceding months. The July 26, 2001 press release stated, in relevant part::

> In addition to charges associated with the Global Realignment Program, **the Company incurred charges of approximately $270 million for the write-down of excess inventory in the fourth quarter related to its lowered sales forecasts.** All of the foregoing amounts are greater than estimates previously announced because of further reductions in sales forecasts.
> \*       \*       \*
> As announced in April, the Company has evaluated the carrying value of certain long-lived assets and acquired equity investments, consisting primarily of goodwill and the Company's investment in ADVA.   Pursuant to Generally Accepted Accounting Principles (GAAP), the majority of the goodwill was recorded based on stock prices at the time merger agreements were executed and announced.   The Company's policy is to assess enterprise level goodwill if the market capitalization of the Company is less than its net assets with goodwill being reduced to the extent net assets are greater than market capitalization.
>
> Downturns in telecommunications equipment and financial markets have created unique circumstances with regard to the assessment of long-lived assets, and the Company sought the counsel of the Staff of the Securities and Exchange Commission on the interpretation of GAAP with regard to this matter.   The Company has had communications with the Staff of the SEC, and will amend its Quarterly Report on Form 10-Q for the quarter ended March 31, 2001 to reduce the carrying value of goodwill by $38.7 billion for that quarter.   In addition, the Company has recorded a $6.1 billion reduction of goodwill for the quarter ended June 30, 2001 following further declines in its market capitalization.   Finally, approximately $300 million in certain amounts paid to SDL executives in connection with the acquisition which were previously recorded as acquisition costs in the quarter ended March 31, 2001 have been reclassified as a one-time charge for that period...

165.   Of the $38.7 billion write down in goodwill as of March 30, 2001, approximately $13 billion was attributable to the E-TEK acquisition.  That $13 billion impairment should have been disclosed to investors no later than July 2000, and written down by September 30, 2000.

166.   The $270 million inventory write-down represented 72%, 68%, 55% and 40% of the Company's stated inventory balances as of, respectively, the close fiscal 2000, the first quarter of fiscal 2001, the second quarter of fiscal 2001, and the third quarter of fiscal 2001.

167.   In response to defendants July 26, 2001 disclosures, on July 27, 2001, JDS stock dropped to $8.55 per share, while the GOALs fell to 58.25% of their par value.

168.   Reflecting on July 27, 2001, *The Wall Street Journal* noted:

The magnitude and speed of JDS's fall are breathtaking. A year ago, it was scrambling to increase its manufacturing capacity of lasers, amplifiers and filters fourfold, as it struggled to keep up with orders from communications-gear makers. Now, JDS has far more buildings, equipment and people than it needs. In addition to the layoffs, JDS said it is vacating about two million square feet of office and factory space, roughly 30% of its space before the downturn, and selling its three airplanes. JDS will shutter 25 buildings in nine cities around the world.

169.    On July 28, 2001, the *San Jose Mercury News* summed up the situation by stating: "JDS said Thursday that it lost $51 billion in the 12 months that ended June 30 – the worst full-year loss in U.S. history – including a huge write-off related to past acquisitions and the dramatic decline in its stock price."

## SCIENTER ALLEGATIONS

170.    Defendants, when making the statements and representations that plaintiff here alleges to have been materially false and misleading, knew such statements to have been materially false and misleading or were deliberately reckless in not knowing such statements to have been materially false and misleading, for the reasons detailed below (*see* ¶¶ 171-185). Additionally, defendants possessed both motive and opportunity to make the material misrepresentations alleged herein (*see* ¶¶ 186-196), primarily in order to complete acquisitions paid for with $35 billion worth of (inflated) company stock and in order to receive, during the Class Period, approximately $500 million from insider sales of millions of shares while in possession of materially adverse information which, had it been publicly disclosed, would have made such acquisitions more expensive and such insider selling less lucrative.

### A.    Defendants' Actual Knowledge

171.    JDS management, including the Individual Defendants, used an Oracle database system to monitor closely the customer orders, shipments, sales and inventory levels. As Defendant Muller admitted in a July 26, 2000 conference call, this information was available to "all parts of the company", and was accessible to each of the Individual Defendants. Weekly sales and inventory reports from this Oracle database system were printed out and distributed – according to Confidential Witness No. 8, an executive assistant to an officer in the company's San Jose headquarters whose desk was outside the offices of Defendants Kalkhoven and Muller – to senior

1    executives of JDS, including Defendant Muller, who shared the information with Defendant

2    Kalkhoven.  According to Confidential Witness No. 8, and entirely consonant with Defendant

3    Muller's July 26, 2000 admission, anyone with access to the Oracle system (including all senior

4    management, such as the Individual Defendants), was able to request and receive daily updates

5    regarding orders, shipments, sales and inventory levels.

6           172.   The company's internal inventory of finished and unfinished products,

7    according to Confidential Witness Nos. 5, 7 and 8 (a Logistics Analyst in West Trenton, New

8    Jersey; a controller in Horsham, Pennsylvania, and an accountant in Windsor, Connecticut), was

9    tracked closely by the Oracle system.  Because JDS' products were often manufactured to each

10   customer's specifications, such products were often not transferrable for sale to other customers

11   should the original customer return them or should JDS manufacture in excess of customer orders.

12   For this reason, along with the rapid pace of technological change that often rendered obsolete and

13   worthless older products languishing in inventory, JDS operated under a "just in time" system in

14   order more closely align manufacturing output with customer orders and thus keep inventories as

15   low as possible.  In fact, according to Confidential Witness No. 4 (an assembly line worker in

16   Bloomfield, Illinois), JDS had a "no inventory" policy for finished products at its own facilities –

17   meaning that products completed by JDS were shipped immediately to customers and often held

18   in customers' inventory until needed.  According to Confidential Witness No. 4, JDS also kept close

19   track of how much inventory remained in its customers' locations, so that when customers actually

20   deployed the products from inventory JDS could manufacture further products to re-fill customer

21   inventory.

22          173.   Despite the company's no inventory policy, and as detailed in ¶¶ 56-63,

23   inventory at JDS began to pile up starting in March 2000 when demand for JDS products began to

24   decline and as customers began increasingly to return products to JDS.  By virtue of the monitoring

25   and reporting systems described above, defendants were aware of the inventory increases, and were

26   also aware that, due to customer specificity and ever-slackening demand, much of the value of such

27   inventory would have to be written off.

28

Complaint for Violation of the
Securities Exchange Act of 1934          - 51 -

174.    By mid-2000, middle and senior level management in JDS' headquarters in Ottawa, including Straus, had irrefutable knowledge about the declining demand for the Company's products.   According to Confidential Witness No. 44 (the Materials Manager for Optical Component Services at JDS' Ottawa facility), business unit managers were told that by mid-2000, they were overestimating their demand for component parts that were to be used in JDS' products.

(a)    Pursuant to JDS' practices and procedures, every business unit manager reported their demand for the next quarter to Confidential Witness No. 44.

(b)    In mid-2000, it was apparent that demand was overestimated, because at the same time that the business units were requesting new optical components, Confidential Witness No. 44 personally observed that those same optical components were building up on the shelves of the business units.

(c)    Confidential Witness No. 44 stated that Thomas Pitre, the Manager of the Demand Management Department in the Company headquarters in Ottawa, was specifically informed of the problem with demand. Confidential Witness No. 44 also stated that this information regarding declining demand was also reported to Vice President Ross McDonald and Supply Chain Vice President Mario Laduc who, in turn, reported such changes to defendant Straus.

175.    JDS monitored its sales forecasts and demand through a process known internally as the "Redbook."  According to Confidential Witness No. 45 (a project manager in Ottawa), the Redbook was essentially a spreadsheet that listed the numbers and names of the projects, quantities, quotas and anticipated profits.  The information was compiled onto a master spreadsheet by the corporate accounting department and made available to top JDS management, including each of the Individual Defendants.

176.    Confidential Witness No. 46 (a Senior Materials Manager in Ottawa), explained that the purpose of the Redbook was to "try to tie everything together".  Specifically, JDS' internal spending forecasts had to match up with customer demand.  The Redbook was used to determine whether JDS' forecasts were "real".  Confidential Witness No. 46 added that the Redbook forecasts were verified up "through the ranks".

177.     The employees in charge of the Redbook met weekly on Thursdays during 2000 to discuss current demand levels and any changes thereto.  However, pursuant to the corporate culture at JDS, which strongly encouraged aggressive forecasts, the Redbook team did not want to officially acknowledge the bad news with respect to demand or sales, and delayed downward revisions of its forecasts as long as possible.  Indeed, Confidential Witness No. 22 (a materials planner at the Bloomfield facility, whose responsibilities included planning a product line that generated approximately $80 million annually), stated that he couldn't understand why the Company forecasters set targets that clearly were not realistically attainable in 2000 and 2001.

178.     As a result of the downturn observed by Defendants in the Spring and early Summer of 2000, JDS materially reduced its *internal* sales forecasts no later than August 2000.  This material reduction in forecasted demand is established by an internal JDS e-mail sent on August 18, 2000 from Thomas G. Pitre, the Manager of JDS' Demand Management Department in Ottawa to 20 JDS employees on the Company's "Redbook Team," whose job it was to forecast demand for the Company's products (the "Pitre e-mail").

179.     The Pitre email stated, in relevant part:

> Our weekly Thursday Redbook meeting proved to be an enlightening experience. **Considering all the recent demand changes over the past few weeks,** we are still on track to finish the Redbook submission prior to the quarter end.  The forecasting group has committed to publishing a "revised forecast", first thing Monday.  **This "revised forecast" will have changes relating to the Nortel and Lucent changes, as well as others. . . .**
>
> I have noticed through various conversations with Redbook folks that a major disconnect exists between future forecasted demand and our growth curve.  It seems that we have a divergence between our overarching growth of 25% QTR/QTR and the forecast demand out in Q3 and Q4.  **So stated plainly the forecast out in Q3 and Q4 is substantially less than our projected growth curve. . . .** (emphasis added)

180.     The Redbook forecasts referred to in the Pitre email were provided to senior executives, including Defendant Straus.  The Pitre e-mail makes clear that JDS management, including the Individual Defendants, knew about the reduced demand at the same time that they were selling nearly $400 million in JDS stock between July 31, 2000 and August 31, 2000.

181.   The Pitre e-mail evidences that, *prior* to August 18, 2000, the Redbook group noted and discussed the declining demand for the Company's products and the resulting need to decrease the Company's forecasts.  Defendants disclosed to the public neither this discussion nor defendants' resulting *internal* reduction in sales forecast.  No corresponding disclosure was made until five months later, in January 2001, after the Individual Defendants sold more approximately $400 million of JDS stock, and even then such disclosure was partial and materially false and misleading, to be followed by further corrective disclosures extending through July 2001 that further reduced forecasted growth (*see* ¶¶ 154-167).

182.   The Pitre e-mail confirms at a high level the detailed information provided by many of the Confidential Witnesses -- former JDS employees – who stated (*see* ¶¶ 56-60) that demand had slowed down prior to August 2000, that large customers such as Nortel and Lucent had returned products and canceled orders, and that JDS management had already taken various steps, including cutting overtime, reducing shifts, and planning a global reorganization of the Company in reaction to that reduction in demand.

**B.   The Sheer Size of the Goodwill and Inventory Writedowns**

183.   JDS acquired E-TEK on June 30, 2000, and, at the time, recorded approximately $15.7 billion in goodwill in connection with the acquisition.  The $15.7 billion was included on the Company's balance sheet as of June 30, 2000.  On July 26, 2001, defendants belatedly announced that they would write off $38.7 billion in goodwill as of the third quarter of fiscal 2001 (the quarter ended March 30, 2001) and a further $6 billion as of the end of fiscal 2001.  This was the largest write-off in corporate history.  That $38 billion of the impairment would all occur in one quarter is extremely unlikely if not inconceivable.

184.   For the reasons detailed in ¶¶ 68-73 above, defendants knew or were reckless in not knowing that the goodwill associated with the E-TEK acquisition was impaired from the moment it was recorded and should have disclosed that fact to investors no later than July 2000.  Moreover, the staggering, unprecedented size of the goodwill writedown that defendants finally

disclosed on July 26, 2001 – i.e., $44 billion – itself suggests that defendants could not have been unaware of the issue.

185.   Defendants' $270 million inventory write-down – first disclosed to the public in the form of a potential $250 million writedown on June 14, 2001; and disclosed in final form on July 26, 2001 – was massive in both absolute or relative terms. Defendants' $270 million inventory write-down represented 72%, 68%, 55% and 40% of the Company's stated inventory balances as of, respectively, the close fiscal 2000, the first quarter of fiscal 2001, the second quarter of fiscal 2001, and the third quarter of fiscal 2001.  That defendants eventually wrote down approximately half of the value of the goods they were carrying as inventory creates a strong inference that the inventory overvaluation did not "suddenly" occur and did not "suddenly" become apparent, but rather that it was an issue of which defendants had long been aware.

## C.   Defendants' Motive and Opportunity: Defendants Make $35 Billion in Acquisitions Using Inflated JDS Uniphase Stock

186.   During 2000 and 2001, defendants  used inflated JDS shares as the sole currency for a $35 billion spending spree consisting of the purchase of four other companies:

(a)   On November 14, 1999, JDS announced it would acquire Optical Coating Labs ("OCLI") in a stock transaction (0.928 JDS shares for each OCLI share) valued at $2.8 billion. On February 4, 2000, JDS completed the acquisition of OCLI for 54 million shares of JDS stock valued at $2.7 billion.

(b)   On January 18, 2000, JDS announced the acquisition of E-Tek Dynamics ("E-Tek") in a $15 billion stock deal. On June 22, 2000, the Department of Justice cleared the merger with E-Tek. E-Tek shareholders subsequently approved the merger on June 28, 2000. The merger was completed on June 30, 2000 for 150.1 million shares of JDS stock -- a total purchase price of $17.5 billion.

(c)   On April 19, 2000, JDS completed the acquisition of Cronos Integrated Microsystems ("Cronos") for 6.3 million shares of stock valued at $563 million.

(d)   On July 10, 2000, JDS announced the acquisition of SDL Inc., a rival developer and manufacturer of optical networking equipment such as pump lasers, optical

amplifiers and laser modulators, in a stock deal valued at $35.6 billion. The Justice Department approved the acquisition on February 6, 2001, after JDS agreed to divest itself of a laser manufacturing plant in Switzerland.  On February 13, 2001, JDS completed the acquisition of SDL for 334 million shares of JDS stock valued at $14 billion.

187.    Defendants were motivated to, attempted to, and did artificially inflate JDS' share price - by making the statements alleged herein to be materially false and misleading - so as to complete these multi-billion dollar acquisitions on the most advantageous terms possible (e.g., the fewer the shares issued by JDS for its acquisitions, the less dilutive the acquisitions would be for defendants, and the better JDS' reported earnings per share would appear).

188.    This stock price inflation continued not only through the completion of the SDL acquisition in February 2001, but continued through July 2001 until defendants finally disclosed the full truth (which they had known long prior to July 2001) concerning the Company's impaired inventory, goodwill, assets, and business structure.  As a result of this continued inflation of JDS stock, the GOALs were correspondingly inflated throughout the Class Period.

**D.    Defendants' Motive and Opportunity: Defendants Receive $500 Million From Concerted and Concentrated Insider Selling**

189.    As shown in the table below, the four Individual Defendants sold 5 million JDS shares during 2000 and early 2001, *receiving more than half a billion dollars from these insider sales*.

190.    Examined more closely, the Individual Defendants' insider selling was strikingly concentrated within the one month period between July 31, 2000 and August 31, 2000 – which, as detailed above (¶¶ 178-182), is exactly the period during which the company was *internally, and only internally,* reducing its demand and growth projections.  66% of all the shares sold by the Individual Defendants during the Class Period (i.e., 3.29 million of the 5 million total) and 80% of all the proceeds realized by the Individual Defendants during the Class Period ($400 million of the total $500 million) occurred in this brief one month period.

191.    This concentrated, concerted and massive insider selling occurred at a time when defendants' public statements consisted of unqualifiedly positive statements about JDS's

outlook, and immediately followed the release of the Company's impressive (and artificially inflated) Fiscal 2000 results.   However, the Individual Defendants were in possession of undisclosed adverse information about JDS, including information regarding a major reduction in demand for the Company's products beginning no later than March 2000 that became pervasive by June and July 2000 and was confirmed by August 2000 in the Pitre e-mail.  With full knowledge of the Company's earnings management practices and other GAAP violations, and after becoming aware of the declining demand that ultimately would turn into reduced sales and revenues, as well as the rising levels of excess inventory and issues related to the necessity to write down $13 billion in goodwill related to the E-TEK acquisition, the Individual Defendants sold significant portions of their JDS stock during a relatively brief portion of the Class Period.

192.    The Individual Defendants' sales during the Class Period were as follows:

| Defendant | Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| Abbe | 2/18/00 | 40,000 | $ 104.31 | $ 4,172,400 |
|  | 2/18/00 | 120,000 | $ 104.22 | $ 12,506,400 |
|  | 2/22/00 | 80,000 | $ 106.22 | $ 8,497,600 |
|  | **8/1/00** | **50,000** | **$ 117.15** | **$ 5,857,500** |
|  | **8/11/00** | **100,000** | **$ 117.10** | **$ 11,710,000** |
|  | 2/26/01 | 50,000 | $ 32.91 | $ 1,645,500 |
|  | 2/27/01 | 25,000 | $ 29.62 | $ 740,500 |
|  | 2/28/01 | 25,000 | $ 27.34 | $ 683,500 |
|  |  | 490,000 |  | $ 45,813,400 |
|  |  |  |  |  |
| Kalkhoven | 11/8/99 | 128,000 | $ 48.50 | $ 6,208,000 |
|  | 11/8/99 | 140,000 | $ 47.85 | $ 6,699,000 |
|  | 11/9/99 | 14,000 | $ 47.50 | $ 665,000 |
|  | 11/9/99 | 144,704 | $ 46.93 | $ 6,790,959 |
|  | 11/10/99 | 122,000 | $ 46.79 | $ 5,708,380 |
|  | 11/23/99 | 50,000 | $ 60.67 | $ 3,033,500 |
|  | 11/30/99 | 40,000 | $ 59.82 | $ 2,392,800 |
|  | 5/22/00 | 100,000 | $ 83.80 | $ 8,380,000 |
|  | 5/22/00 | 130,000 | $ 77.65 | $ 10,094,500 |
|  | 5/24/00 | 180,000 | $ 76.68 | $ 13,802,400 |
|  | **7/31/00** | **250,000** | **$ 117.00** | **$ 29,250,000** |
|  | **7/31/00** | **250,000** | **$ 119.50** | **$ 29,875,000** |
|  | **8/4/00** | **62,500** | **$ 119.68** | **$ 7,480,000** |
|  | **8/7/00** | **100,000** | **$ 119.81** | **$ 11,981,000** |

| | Defendant | Date | Shares | Price | | Proceeds |
|---|---|---|---|---|---|---|
| 1 | | | | | | |
| 2 | | 8/21/00 | 110,000 | $ 125.00 | $ | 13,750,000 |
| 3 | | 8/22/00 | 100,000 | $ 125.10 | $ | 12,510,000 |
| | | 8/22/00 | 140,000 | $ 124.63 | $ | 17,448,200 |
| 4 | | 8/31/00 | 100,000 | $ 124.22 | $ | 12,422,000 |
| 5 | | 8/31/00 | 200,000 | $ 120.03 | $ | 24,006,000 |
| | | | 2,361,204 | | $ | 222,496,739 |
| 6 | Muller | 11/8/99 | 40,000 | $  48.75 | $ | 1,950,000 |
| 7 | | 11/12/99 | 80,000 | $  48.78 | $ | 3,902,400 |
| | | 11/19/99 | 40,000 | $  54.79 | $ | 2,191,600 |
| 8 | | 5/22/00 | 10,000 | $  82.63 | $ | 826,300 |
| 9 | | 5/30/00 | 10,000 | $  84.19 | $ | 841,900 |
| | | 7/31/00 | 35,000 | $ 117.41 | $ | 4,109,350 |
| 10 | | 8/1/00 | 20,000 | $ 117.23 | $ | 2,344,600 |
| | | 8/2/00 | 20,000 | $ 117.00 | $ | 2,340,000 |
| 11 | | 8/4/00 | 2,500 | $ 120.00 | $ | 300,000 |
| 12 | | 8/4/00 | 5,000 | $ 118.00 | $ | 590,000 |
| | | 8/4/00 | 5,000 | $ 118.23 | $ | 591,150 |
| 13 | | 8/4/00 | 5,000 | $ 118.50 | $ | 592,500 |
| 14 | | 8/7/00 | 37,500 | $ 120.00 | $ | 4,500,000 |
| | | 8/8/00 | 25,000 | $ 122.00 | $ | 3,050,000 |
| 15 | | 8/11/00 | 50,000 | $ 117.08 | $ | 5,854,000 |
| | | 8/11/00 | 50,000 | $ 119.94 | $ | 5,997,000 |
| 16 | | 8/14/00 | 25,000 | $ 119.24 | $ | 2,981,000 |
| | | 8/14/00 | 25,000 | $ 119.74 | $ | 2,993,500 |
| 17 | | 8/15/00 | 50,000 | $ 119.94 | $ | 5,997,000 |
| 18 | | | 535,000 | | $ | 51,952,300 |
| 19 | Straus | 11/8/99 | 26,700 | $  47.71 | $ | 1,273,857 |
| | | 11/8/99 | 52,944 | $  47.71 | $ | 2,525,958 |
| 20 | | 8/1/00 | 16,020 | $ 117.00 | $ | 1,874,340 |
| 21 | | 8/1/00 | 95,352 | $ 117.00 | $ | 11,156,184 |
| | | 8/1/00 | 156,000 | $ 117.06 | $ | 18,261,360 |
| 22 | | 8/1/00 | 394,000 | $ 117.00 | $ | 46,098,000 |
| | | 8/1/00 | 396,672 | $ 117.00 | $ | 46,410,624 |
| 23 | | 8/4/00 | 4,500 | $ 117.69 | $ | 529,605 |
| 24 | | 8/4/00 | 5,200 | $ 118.00 | $ | 613,600 |
| | | 8/7/00 | 25,000 | $ 118.13 | $ | 2,953,250 |
| 25 | | 8/7/00 | 34,100 | $ 118.02 | $ | 4,024,482 |
| | | 8/7/00 | 35,000 | $ 118.06 | $ | 4,132,100 |
| 26 | | 8/7/00 | 96,200 | $ 118.00 | $ | 11,351,600 |
| | | 8/8/00 | 210,000 | $ 121.19 | $ | 25,449,900 |
| 27 | | | | | | |
| 28 | | | | | | |

| Defendant | Date | Shares | Price | Proceeds |
|-----------|------|--------|-------|----------|
| | 2/1/01 | 25,424 | $ 55.49 | $ 1,410,778 |
| | 2/1/01 | 74,576 | $ 55.49 | $ 4,138,222 |
| | 3/6/01 | 800 | $ 30.06 | $ 24,048 |
| | 3/6/01 | 20,000 | $ 30.00 | $ 600,000 |
| | | 1,668,488 | | $ 182,827,908 |
| **Totals** | | **5,054,692** | | **$ 503,090,347** |

193.    The Individual Defendants were motivated to, attempted to, and did artificially inflate JDS' share price - by making the statements alleged herein to be materially false and misleading, and by failing to disclose the adverse contradictory information then in their possession - so as to be able to complete their insider selling on the most lucrative terms possible.

194.    Defendants concerted sales in August 2000 were completed as JDS stock was trading near the highest prices it ever recorded.  However, JDS shares continued to be inflated after August 2000 and until July 2001, when defendants finally disclosed the full truth (which they had known long prior to July 2001) concerning the Company's impaired inventory, goodwill, assets, and business structure.  As a result of this continued inflation of JDS stock, the GOALs were correspondingly inflated throughout the Class Period.

**E.    Defendants' Motive and Opportunity: Meeting Incentive Compensation Targets Results in Grants of Millions of Stock Options, Which Formed Much of the Basis for the Individual Defendants' Insider Sales**

195.    JDS offered its senior executives, including the Individual Defendants, potentially lucrative incentive compensation bonuses based on the results achieved or reported for JDS. The Company's 2000 Proxy, filed with the SEC in October 2000, explained:

The fundamental policy of the Compensation Committee is to provide the Company's chief executive officer and executive vice presidents with competitive compensation opportunities based upon their contribution to the financial success of the Company and their personal performance. It is the Compensation Committee's objective to have a substantial portion of each officer's compensation contingent upon the Company's

performance as well as upon his or her own level of performance. Accordingly, the compensation package for the chief executive officer and executive vice presidents is comprised of three elements: (i) base salary which reflects individual performance and is designed primarily to be competitive with salary levels in the industry, (ii) annual variable performance awards payable in cash and tied to the Company's achievement of financial performance targets, and (iii) long-term stock-based incentive awards which strengthen the mutuality of interests between the executive officers and the Company's stockholders. As an executive officer's level of responsibility increases, it is the intent of the Compensation Committee to have a greater portion of his or her total compensation be dependent upon Company performance and stock price appreciation rather than base salary.

196.   Many of the shares sold by the Individual Defendants in their insider sales as detailed immediately above were first acquired by the Individual Defendants in the form of stock options grants awarded to them as incentive compensation for having met certain financial targets:

(a)   For the (false) financial results reported for fiscal 2000 (ended June 30, 2000), defendant Kalkhoven received a cash bonus of $350,000 and 3.2 million stock options;

(b)   For the (false) financial results reported for fiscal 2000 (ended June 30, 2000), defendant Strauss received a cash bonus of $278,000 and 9.6 million stock options;

(c)   For the (false) financial results reported for fiscal 2000 (ended June 30, 2000), defendant Muller received a cash bonus of $139,000 and 1.2 million stock options.

197.   The Individual Defendants were therefore motivated to cause JDS to report materially false and misleading financial results, and to make the false and misleading statements complained of herein, in order to receive incentive compensation of hundreds of millions of dollars.

## FALSE FINANCIAL STATEMENTS

198.   All quarterly and annual financial results reported by defendants prior to July 26, 2001, and quarterly and annual financial statements issued by defendants prior to July 26, 2001, purported to presented in accordance with Generally Accepted Accounting Principles ("GAAP"). For instance, each Form 10-Q filed with the SEC by JDS stated that:

1
2
3
4

> The financial information at [Quarter end] and for the [period then ended] is unaudited, but includes all adjustments (consisting only of normal recurring adjustments) that the Company considers necessary for a fair presentation of the financial information set forth herein, in accordance with generally accepted accounting principles for interim financial information, the instructions to Form 10-Q and Article 10 of Regulation S-X.

199.    This statement was false and misleading as to the financial information reported included in the Form 10-Qs, as such financial information was not prepared in conformity with GAAP.

200.    GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. §210.10-01(a).

201.    The revenues reported by defendants at all times prior to July 26, 2001 were materially inflated, and were not reported in accordance with GAAP, because:

(a)    JDS, in contravention of GAAP, improperly recognized revenue from products that it shipped to customers with the understanding that such customers would hold the products in their inventory without any obligation to pay JDS unless and until the customer "pulled down" the product from inventory and put it to use.  Such customers possessed a right of return for products shipped to them, held in inventory and never "pulled down".  GAAP allows a seller to recognize revenue from a product – when a right of return exists – only if six specific conditions are met.  JDS did not meet two of these six conditions.  Whereas SFAS No. 48, ¶6.b. requires that "the buyer has paid the seller, or the buyer... is obligated to pay the seller and the obligation is not

contingent on resale of the product", JDS' customers were not obligated to pay JDS until customers actually used the products.  Furthemore, whereas SFAS No. 48, ¶6.c. requires that a "buyer's obligation to the seller would not be changed in the event of theft or physical destruction or damage of the product", such was not the case for JDS' customers, who had no obligation for the JDS products that the customers held in their inventories.

(b)      JDS, in contravention of GAAP, improperly recognized revenue from fraudulently-arranged shipments of products at certain quarter-ends (*see* ¶¶ 54-55), which products would be returned untouched after the quarter close.  These fictional sales served as the "justification" for (fraudulently) booking millions of  revenue each quarter.  According to AU § 411.06, GAAP "recognize[s] the importance of reporting transactions and events in accordance with their substance".  Defendants' recognition of millions of dollars of revenue each quarter from false shipments dressed up in the *form* of real customer sales fails this requirement of substance.

202.     Furthermore, defendants violated GAAP by failing to record required write-downs of JDS' inventory as of June 30, 2000, September 30, 2000, December 30, 2000, and March 31, 2000, and by overstating the value of its inventory as of each of these dates in JDS' financial statements.

203.     GAAP, as set forth in Accounting Research Bulletin No. 43, Chapter 4, requires that inventory be stated at cost or market, whichever is lower.  When there is evidence that the market value is less than cost, inventory is to be written down to market and a corresponding loss recognized in the income statement.  As detailed above in ¶¶ 56-64 and 175-182, the reduction in demand for JDS' products, the downward revision of internal sales forecasts, the fact that many JDS products were built to unique customer specifications, the cancellation and return of orders by customers, the buildup of excess inventories for which JDS had no firm orders and could expect

no firm orders, and the rapidly changing technology in the fiber optic marketplace all evidenced that the market value of JDS' inventory was less than cost.

204.    Defendants, when belatedly announcing their inventory write-down, claimed that JDS policy was to write off inventory in excess of six months of supply.  However, as set forth in ¶ 60(b) above, by no later than June 2000, JDS already had more than a one-year supply of inventory at its headquarters in San Jose due to reduced demand.  In fact, starting in the Spring of 2000, JDS was accumulating excess inventory due to reduced demand. Nevertheless, Defendants failed to record adequate and timely inventory reserves until, in the fourth quarter of fiscal 2001, defendants belatedly recorded an inventory write-down for excess inventory of $270 million (approximately 40% of the amount of inventory on its books as of  March 31, 2001).

205.    Further, defendants also violated GAAP by failing to write down the goodwill associated with the E-TEK acquisition by September 30, 2000.  According to defendants, JDS' policy – which it articulated only at the time it belatedly revealed its multi-billion dollar write-downs – was to reassess the value of its goodwill when its market capitalization goes below its net assets. This policy is in contravention of GAAP.  FAS 121, ¶ 5 provides that an "entity shall review long-lived assets and certain identifiable intangibles to be held and used for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable."  The dramatic decline in demand during the Summer of 2000 was a change in circumstance that required defendants to review the recoverability of the goodwill by no later than first quarter of fiscal 2001.

206.    When defendants did eventually write off most of the E-TEK goodwill as of the third quarter of fiscal 2001 (a write-off announced one month into fiscal 2002 and made retroactive), they stated that JDS determined the goodwill impairment based on future cash flows

for operating entities that had separately identifiable cash flows.  These calculations, however, would have revealed the impairment as of September 30, 2000.  Thus, pursuant to GAAP, defendants should have determined that the goodwill recorded in connection with the E-TEK acquisition was impaired by September 30, 2000 and should have written off at that time.

207.    During and prior to the Class Period, the largest item on JDS' balance sheet was Intangible Assets – which are primarily goodwill. Because they were such a significant part of JDS' financial statements, comprising more than half of total assets, the accounting treatment for them was crucial to the proper and accurate determination of JDS' net income.

208.    GAAP, as set forth in FASB Statement of Standards ("SFAS") No. 121, requires that companies review long lived assets, including goodwill, to determine if the assets are impaired. SFAS No. 121, ¶¶ 5-6:

> 5. The following are examples of events or changes in circumstances that indicate that the recoverability of the carrying amount of an asset should be assessed:
> a.    A significant decrease in the market value of an asset
> b.    A significant change in the extent or manner in which an asset is used or a significant physical change in an asset
> c.    A significant adverse change in legal factors or in the business climate that could affect the value of an asset or an adverse action or assessment by a regulator
> d.    An accumulation of costs significantly in excess of the amount originally expected to acquire or construct an asset
> e.    A current period operating or cash flow loss combined with a history of operating or cash flow losses or a projection or forecast that demonstrates continuing losses associated with an asset used for the purpose of producing revenue.
>
> 6. If the examples of events or changes in circumstances set forth in paragraph 5 are present or if other events or changes in circumstances indicate that the carrying amount of an asset that an entity expects to hold and use may not be recoverable, the entity shall estimate the future cash flows expected to result from the use of the asset and its eventual disposition. Future cash flows are the future cash inflows expected to be generated by an asset less the future cash outflows expected to be necessary to obtain those inflows. If the sum of the expected future cash flows (undiscounted and without interest charges) is less than the carrying amount of the asset, the entity shall recognize an impairment loss in accordance with this Statement. Otherwise, an impairment loss

1   shall not be recognized; however, a review of depreciation policies may be appropriate.

2   (Footnote omitted.)

3

4   209.    By failing to properly value these assets and to adequately reflect the

5   deterioration in value of the goodwill, defendants materially overstated the Company's earnings

6   during and prior to the Class Period leading up to defendant's belated disclosure, in July 2001, of

7   a quarterly and annual loss in the tens of billions of dollars due to goodwill writedowns.

8   210.    Finally, defendants violated GAAP by improperly recording the $300 million

9   paid to SDL executives in connection with the SDL transaction as acquisition costs rather than

10  compensation expenses in third quarter of fiscal 2001 (ended March 31, 2001) as required by APB

11  ¶ 16, which mandates that indirect and general expenses related to acquisitions be deducted at they

12  time they are incurred.  JDS later conceded, by restating its Third Quarter 2001 10-Q in September

13  2001 in order to reclassify the $300 million as compensation expense, that its accounting treatment

14  resulted in a material error to its fiscal third quarter financial statements.  GAAP provides that

15  financial statements should only be restated in limited circumstances; that is, when there is a change

16  in reporting entity, there is a change in accounting principles used, or to correct a material error in

17  previously issued financial statements.  JDS' restatement was clearly not due to a change in

18  reporting entity or a change in accounting principles, but rather to correct material accounting errors

19  in previous financial statements

20  211.    Due to these accounting improprieties, the Company presented its financial

21  results and statements in a manner which violated GAAP, including the following fundamental

22  accounting principles:

23  (a)    The principle that interim financial reporting should be based upon the same

24  accounting principles and practices used to prepare annual financial statements was violated (APB

25  No. 28, ¶ 10);

26

27

28

(b)      The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, ¶ 34);

(c)      The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, ¶ 40);

(d)      The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶ 50);

(e)      The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶ 42);

(f)      The principle that financial reporting should be reliable in that it represents what it purports to represent was violated. That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶ 58-59);

(g)      The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, ¶ 79); and

(h)      The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered

1    was violated. The best way to avoid injury to investors is to try to ensure that what is reported

2    represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶ 95, 97).

3              212.    Further, the undisclosed adverse information concealed by defendants during

4    the Class Period is the type of information which, because of SEC regulations, regulations of the

5    national stock exchanges and customary business practice, is expected by investors and securities

6    analysts to be disclosed and is known by corporate officials and their legal and financial advisors

7    to be the type of information which is expected to be and must be disclosed.

8              **DEFENDANTS' MISREPRESENTATIONS PROXIMATELY CAUSED**
     **PLAINTIFFS' DAMAGES THROUGH A FRAUD ON THE MARKET**
9

10             213.    At all relevant times, the market for JDS securities was an efficient market that

11   promptly digested current information with respect to the Company from all publicly-available

     sources and reflected such information in JDS' stock price and the price of the GOALs linked to
12
     JDS' stock.
13

14             214.    The common stock of JDS  met the requirements for listing, and was listed

15   and actively traded on the NASDAQ stock exchange, a highly developed and efficient market.  The

     GOALs  met the requirements for listing, and were listed and actively traded on the American stock
16
     exchange, a highly developed and efficient market.  During the Class Period, JDS stock was heavily
17
     traded, with volume averaging approximately 29 million shares daily.  JDS filed periodic public
18
     reports with the SEC, and was followed by analysts from virtually every major brokerage.  The
19
     reports of these analysts were redistributed to their customers and the public at large, and JDS
20
     regularly issued press releases, which were carried by national newswires.  Thus, the analyst reports
21
     and JDS' press releases entered the public marketplace.  As a result, the market for JDS securities
22
     promptly digested current information with respect to JDS from all publicly-available sources, and
23
     reflected such information in JDS' stock price and in the price of the GOALs linked to JDS' stock.
24
     Plaintiff and other members of the Class relied on the integrity of the market price of JDS' stock
25
     and of the GOALs linked to that stock.
26
               215.    As would be expected where a security is traded in an efficient market,
27
28   material news concerning JDS' business and prospects had an immediate effect on the market price

1   of JDS stock and upon the GOALs which were expressly linked to that stock, as evidenced by the

2   market price declines of both stock and GOALs in the immediate aftermath of defendants' April

3   24, June 14 and July 26, 2001 disclosures.

4         216.   At the times they purchased or otherwise acquired the GOALs, plaintiff and

5   other members of the Class were without knowledge of the facts concerning the wrongful conduct

6   alleged herein and could not have reasonably discovered those facts.

7                          **CLASS ACTION ALLEGATIONS**

8         217.   Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal

9   Rules of Civil Procedure on behalf of all persons who purchased GOALs (the "Class") during the

10  Class Period. Excluded from the Class are defendants and JDS' officers and employees.

11        218.   The members of the Class are so numerous that joinder of all members is

12  impracticable. The disposition of their claims in a class action will provide substantial benefits to

13  the parties and the Court. $51 million worth of GOALs was issued during the class period, owned

14  by hundreds if not thousands of persons.

15        219.   There is a well-defined community of interest in the questions of law and fact

16  involved in this case. Questions of law and fact common to the members of the Class which

17  predominate over questions which may affect individual Class members include:

18        (a)    Whether the 1934 Act was violated by defendants;

19        (b)    Whether defendants omitted and/or misrepresented material facts;

20        (c)    Whether defendants' statements omitted material facts necessary to make the

21  statements made, in light of the circumstances under which they were made, not misleading;

22        (d)    Whether defendants knew, or recklessly or negligently disregarded, that their

23  statements were false and misleading;

24        (e)    Whether the prices of GOALs were artificially inflated; and

25        (f)    The extent of damage sustained by Class members and the appropriate

26  measure of damages.

27

28

220.    Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

221.    Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

222.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**FIRST CLAIM FOR RELIEF**
**For Violation of §10(b) of the 1934 Act and Rule 10b-5**
**Against All Defendants**

223.    Plaintiff incorporates ¶¶ 1-222 by reference.

224.    During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

225.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)    Employed devices, schemes, and artifices to defraud;

(b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of GOALs during the Class Period.

226.    In making the materially false and misleading statements specified herein, defendants acted with scienter.  As alleged in detail in ¶¶ 47-82 and 171-182, defendants knew that the statements they made and the documents they approved and/or signed were materially false and misleading. Defendants knew that such statements and documents would be issued or disseminated to the public, and knowingly and substantially participated or acquiesced in the issuance or

1    dissemination of such statements or documents. Because, at the time such statements or documents

2    were issued to the public, defendants were in receipt of true and accurate information contradicting

3    their publicly-issued statements and documents, the defendants participated in the fraudulent

4    scheme alleged herein.

5            227.    In addition to their actual knowledge, defendants possessed motive and

6    opportunity – as alleged in detail in ¶¶ 186-96 – to engage in the course of conduct complained of

7    herein. Defendants relied solely on the JDS stock whose value they inflated through their materially

8    false and misleading statements in order to finance and complete $35 billion in acquisitions,

9    including OCLI, E-TEK and SDL. The Individual Defendants, took advantage of JDS' inflated

10   stock price and engaged, while in possession of material adverse information concerning JDS that

11   contradicted their contemporary public representations, in a concentrated and concerted spate of

12   insider selling from which they received proceeds of approximately $500 million.

13           228.    As a result of defendants' materially false and misleading statements, the

14   market price of JDS stock and of the GOALs (which was expressly linked to the price of JDS stock)

15   was artificially inflated.

16           229.    Plaintiff and the Class have suffered damages in that, in reliance on the

17   misrepresentations concerning JDS and/or the integrity of the markets for JDS stock and/or the

18   GOALs, they paid artificially inflated prices for GOALs. Plaintiff and the Class would not have

19   purchased GOALs at the prices they paid, or at all, had they been aware that the market prices had

20   been artificially and falsely inflated by defendants' misleading statements.

21           230.    As a direct and proximate result of defendants' wrongful conduct, plaintiff and

22   the other members of the Class suffered damages in connection with their purchases of GOALs

23   during the Class Period.

24           231.    By virtue of the foregoing, Defendants have violated Section 10(b) of the 1934

25   Act and SEC Rule 10b-5 promulgated thereunder.

26

27

28

**SECOND CLAIM FOR RELIEF**
**For Violation of §20(a) of the 1934 Act**
**Against the Individual Defendants**

232.    Plaintiff incorporates ¶¶ 1-231 by reference.

233.    By reason of their positions as officers and/or directors of JDS, the Individual Defendants had and exercised the power and authority to cause JDS to engage in the wrongful conduct complained of herein.  As a direct and proximate result of defendants' wrongful conduct, plaintiff and the Class suffered damages in connection with their GOALs investments.  By reason of such conduct, these defendants are liable pursuant to Section 20(a) of the 1934 Act.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff prays for judgment as follows:

A.    Declaring this action to be a proper class action pursuant to Rule 23;

B.    Awarding plaintiff and the members of the Class damages, interest and costs; and

C.    Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated:    February 4, 2005          Respectfully submitted,

**GLANCY BINKOW & GOLDBERG LLP**

By:   /s/ Susan G. Kupfer

SUSAN G.. KUPFER
GLANCY BINKOW & GOLDBERG LLP
455 Market Street, Suite 1810
San Francisco, CA 94105
Telephone:  (415) 972-8160
Facsimile:    (415) 972-8166

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

IRA M. PRESS
KIRBY McINERNEY & SQUIRE, LLP
830 Third Avenue, 10th Floor
New York, New York  10022
Telephone:    (212) 371-6600
Fax:             (212) 751-2540

LIONEL Z. GLANCY
GLANCY BINKOW & GOLDBERG LLP
1801 Avenue of the Stars
Los Angeles, CA
Telephone:    (310) 201-9150
Fax:             (310) 201-9160

Kenneth A. Elan, Esq.
LAW OFFICES OF KENNETH A. ELAN
217 Broadway, Suite 404
New York, NY  10007
Telephone:    (212) 619-0261
Fax Number:  (212) 385-2707

Attorneys  for  Plaintiff  SHIRLEY  ZELMAN,
TRUSTEE, F/B/O SHIRLEY ZELMAN LIVING
TRUST,