United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

SHIRLEY ZELMAN, TRUSTEE, F/B/O
SHIRLEY ZELMAN LIVING TRUST,
on behalf of plaintiff and all others
similarly situated,

        Plaintiff,

  v.

JDS UNIPHASE CORPORATION,
JOZEF STRAUS, KEVIN
KALKHOVEN,
ANTHONY R. MULLER and
CHARLES J. ABBE,

        Defendants.

_____/

Master File No. C-02-4656 CW (WWS)

_____

**ORDER DENYING IN PART AND
GRANTING IN PART
DEFENDANTS' MOTIONS TO
DISMISS**

       Shirley Zelman, a purchaser of securities called GOALs, brings this securities

fraud action against JDS Uniphase Corporation (JDSU) and four of its former directors

on behalf of herself and other GOALs purchasers.  JDSU and Kevin Kalkhoven, one of

its former directors, have moved separately to dismiss the Complaint.  For the reasons

presented below, the Court denies the JDSU defendants' motion to dismiss and grants in

part Kalkhoven's motion to dismiss, with leave to amend.

United States District Court
For the Northern District of California

**BACKGROUND**

Since the Court is considering Defendants' motions to dismiss, the following description is drawn from Plaintiff's complaint. *See In re Daou Systs., Inc., Sec. Litig.*, 397 F.3d 704, 709-10 (9th Cir. 2005) ("[W]e accept the plaintiffs' allegations as true and construe them in the light most favorable to plaintiffs.") (internal quotation marks and citation omitted).

The GOAL notes Plaintiff purchased were "equity-linked" debt securities issued by the Swiss bank UBS AG (UBS). The GOALs sold at a face value of $1000, paid 26% interest per annum, and were set to mature on September 12, 2002, 18 months after issuance. The nature of the payment to which holders were entitled at the notes' maturity depended solely on the price at which JDSU common stock was trading on September 9, 2002. If JDSU stock was trading above $28.125 per share, GOALs holders would receive a return of their principal in cash. If JDSU stock was trading below that price, GOALs holders would receive 35.5556 shares of JDSU stock for each $1000 GOAL. This ratio was based on the price of JDSU stock at issuance of the GOALs in March 2001, when JDSU stock was trading for $28.125 per share. GOALs holders had no option to convert their notes to JDSU stock.

The prospectus statement relating to the GOALs that UBS filed with the Securities and Exchange Commission (SEC) included the following statements:

> The return on the GOALs is linked to the performance of JDS Uniphase Corporation common stock and there is no guaranteed return of principal. . . . WE EXPECT THAT GENERALLY THE MARKET PRICE OF JDS UNIPHASE CORPORATION COMMON STOCK ON ANY DAY WILL AFFECT THE VALUE OF THE GOALs MORE THAN ANY OTHER SINGLE FACTOR. . . . Owning the GOALs is not the same as owning common stock of the JDS Uniphase Corporation[.] Accordingly, the market value of your GOALs may not have a direct relationship with the market price of JDS Uniphase Corporation common stock and changes in the market price of JDS Uniphase Corporation common stock may not result in a comparable change in the market value of your GOALs.

United States District Court

For the Northern District of California

1    The proposed plaintiff class is the group of all who purchased GOALs between

2    March 6, 2001,[1] and July 26, 2001.  Plaintiff names as defendants JDSU itself; Jozef

3    Straus, CEO of JDSU since May 2000; Straus's predecessor, Kevin Kalkhoven, CEO of

4    JDSU from June 1999 to May 2000; Anthony R. Muller, CFO and Executive Vice

5    President of JDSU during the proposed class period; and Charles J. Abbe, President and

6    COO of JDSU during the proposed class period.

7    Plaintiff alleges that Defendants' false statements before and during this period

8    caused the GOALs to be issued and to be traded at artificially inflated prices.  Plaintiff's

9    allegations largely parallel the allegations in the related case *In re JDS Uniphase*

10   *Securities Litigation*, No. 02-01486 (N.D. Cal.).  Thus, Plaintiff alleges that during 1999

11   and 2000, JDSU had a practice of fraudulently recognizing revenue in violation of

12   Generally Accepted Accounting Principles (GAAP), that JDSU knowingly and

13   misleadingly concealed dramatic decreases in demand for JDSU products, and that JDSU

14   consistently publicly overstated its assets and goodwill.   Plaintiff further alleges that

15   JDSU and individual officers began to acknowledge the company's problems in January

16   2001 but did not disclose the full extent of the company's poor health until July 2001.

17   Kalkhoven retired as CEO and from the JDSU board of directors on May 18,

18   2000, but Plaintiff alleges that he retained an office at JDSU, often used it, and

19   continued to have access to inside information about JDSU through July 31, 2001.

20   Plaintiff does not, however, allege any actionable statements by Kalkhoven following his

21   retirement.

22   Plaintiff alleges that JDSU management, including all four individual defendants,

23   had knowledge of the discrepancies between the above alleged misstatements and the

24   facts.  Plaintiff maintains that individual defendants had access to the company's Oracle

25   spreadsheet files, which recorded actual inventory, and to the "Redbook," an internal

26   accounting report disseminated to top JDSU management.  Plaintiff alleges specific

27

28   [1]Defendants note that this date is two days before the GOALs were alleged to have been offered to the public.  This discrepancy is not material to the merits of the motions.

United States District Court

For the Northern District of California

1   incidents in which most of the individual defendants consulted or were provided with

2   these materials, although the incidents predate the proposed class period.

3       Plaintiff also alleges that the GOALs were trading on the American Stock

4   Exchange during the class period and that JDSU stock was trading on NASDAQ.

5   Plaintiff points to price declines of both JDSU stock and the GOALs immediately

6   following disclosures by Defendants on April 24, June 14, and July 26, 2001.

7       JDSU and the individual Defendants other than Kalkhoven have moved to dismiss

8   the Complaint on the grounds that Plaintiff lacks standing to sue JDSU, that she has not

9   sufficiently alleged that any misstatements were made "in connection with" the GOALs,

10  that she has not sufficiently alleged that she relied on any misstatements, and that she has

11  not sufficiently alleged that any misstatements were accompanied by scienter.  Defendant

12  Kalkhoven has moved separately for dismissal as to him on the same grounds, as well as

13  on the grounds that as to him Plaintiff has failed to allege any actionable misstatements

14  and has failed to plead causation and scienter adequately.

15                          **DISCUSSION**

16  **I.    STANDING**

17      In arguing that Plaintiff should be held to lack standing, JDSU relies on *Blue Chip*

18  *Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975), and on *Ontario Public Service*

19  *Employees Union Pension Trust Fund v. Nortel Networks Corp.*, 369 F.3d 27 (2d Cir.

20  2004), *cert. denied*, 125 S. Ct. 919 (2005).  The Court concludes, however, that *Blue*

21  *Chip Stamps* and subsequent cases, including *Nortel*, do not indicate that Plaintiff should

22  be held to lack standing.  Since Plaintiff engaged in the type of activity that § 10(b) was

23  enacted to protect, the Court concludes that she should have standing to bring this action.

24      *A.*    Blue Chip Stamps *and Subsequent Cases on Standing*

25      Because private rights of action under § 10(b) were not expressly created by

26  Congress but "have been judicially found to exist, [they also] have to be judicially

27  limited."  *Blue Chip Stamps*, 421 U.S. at 749.  One way of doing this is by limiting the

28  class of plaintiffs who may bring such actions, as the Supreme Court did in *Blue Chip*

United States District Court

For the Northern District of California

1   *Stamps*. *See id; see also Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1000-01

2   (9th Cir. 2002) ("Because neither [§ 10(b) nor Rule 10b-5] contains an express right of

3   action, they also do not delineate who is a proper plaintiff.  In the absence of explicit

4   Congressional guidance, courts have developed various 'standing' limitations, primarily

5   on policy grounds.").

6          In *Blue Chip Stamps*, the leading Supreme Court case on standing in § 10(b)

7   actions, the Court addressed the meaning of the statute's prohibition of fraud "in

8   connection with the *purchase or sale* of any security."  15 U.S.C. § 178j(b) (emphasis

9   added).  The Court held that this language requires a plaintiff to have actually

10  "purchased or sold . . . shares" to have standing under § 10(b).  421 U.S. at 725.  The

11  Court supported the interpretation with a policy analysis, *see id.* at 737-49, noting that if

12  courts recognized the standing of plaintiffs who had not traded in securities but merely

13  claimed they had refrained from trading because of alleged false or misleading

14  statements, the risk of "nuisance or 'strike' suits" would increase.  *Id.* at 740.  Because it

15  would be so difficult to prove or rule out those plaintiffs' alleged decisions not to act

16  other than by oral testimony, plaintiffs of this type would have an enhanced ability to

17  force trial or settlement, even without meritorious claims.  *See id.* at 742-46.

18         Between *Blue Chip Stamps* in 1975 and *Nortel* in 2004, decisions on standing in

19  § 10(b) actions focused on which acts qualify as the "purchase or sale" of "securities."

20  In *Blue Chip Stamps* the Court noted that the securities laws define "contract[s] to

21  purchase or sell securities" as securities, so buyers or sellers of "puts, calls, options, and

22  other contractual rights or duties to purchase or sell securities" have standing under

23  § 10(b).  421 U.S. at 750-51 (citing 15 U.S.C. § 78c(a)).  The Ninth Circuit, extending

24  this reasoning, subsequently held that an individual who acquires "contingent rights to

25  receive stock," but not stock, has standing to sue under § 10(b), even if the individual's

26  future acquisition of actual stock depends entirely on the performance of the company's

27  subsidiaries.  *Griggs v. Pace Am. Group, Inc.*, 170 F.3d 877, 878 (9th Cir. 1999).

28

*B.      "In Connection With" Cases*

A number of courts have also addressed the meaning of the related statutory "in connection with" requirement.  *See, e.g.*, *Semerenko v. Cendant Corp.*, 223 F.3d 165, 174-77 (3d Cir. 2000); *In re Ames Dep't Stores, Inc. Stock Litig.*, 991 F.2d 953, 961-68 (9th Cir. 1993); *In re Worldcom Sec. Litig.*, Nos. 02 Civ. 3288, 03 Civ. 9499, 2004 WL 1435356, at *7-*9 (S.D.N.Y. June 28, 2004).   In opposing JDSU's standing arguments Plaintiff relies primarily on these cases, particularly *Semerenko*[2] and *Worldcom*.[3]

Although the "in connection with" language appears in § 10(b) adjacent to the "purchase or sale" language interpreted in *Blue Chip Stamps*, courts have not considered the "in connection with" issue to be one of standing.  Rather, courts have construed the "in connection with" requirement as an element of the plaintiff's prima facie case.  *See, e.g.*, *Dura Pharms., Inc. v. Broudo*, 125 S. Ct. 1627, 1631 (2005).  Thus these decisions, while relevant to the present case, cannot resolve the question of Plaintiff's standing.  JDSU contends that the Second Circuit's opinion in *Nortel* alone resolves this question.

*C.      Rationale of* Nortel *and Application to the Present Case*

*Nortel* is the first decision to address the standing of holders of securities issued by a company other than the company that made the alleged misstatements and that is named as a defendant.  *See* 369 F.3d at 32.  In *Nortel*, owners of JDSU stock sued Nortel for securities fraud.[4]  The plaintiffs bought their stock before and after Nortel acquired part of JDSU's business.  Nortel paid JDSU with Nortel stock, making JDSU a

---

[2]In *Semerenko*, the Third Circuit held that purchasers of stock in a corporation that had been the target of a failed merger could state a claim against the prospective acquirer of the corporation for misstatements affecting the value of the stock plaintiffs purchased. 223 F.3d at 174-77.  The court concluded that in this context statements made by one corporation could have been made "in connection with" the purchase or sale of stock in another corporation.  *Id.*

[3]In *Worldcom*, the District Court for the Southern District of New York concluded that the "connection" required by § 10(b) may exist between equity-linked debt securities like the GOALs and statements about the value of the stock to which the debt securities are tied. 2004 WL 1435356, at *7-*9.

[4]JDSU's involvement in *Nortel* is coincidental and has no relation to the present action.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1   significant Nortel shareholder.  During the class period Nortel allegedly misrepresented

2   its financial state, inflating the price of Nortel stock and also, according to the plaintiffs,

3   JDSU's stock price.

4          The Second Circuit held that the plaintiffs lacked standing to sue Nortel.  *Id.* at

5   29.  The court concluded that the phrase "any security" in § 10(b) was not meant to

6   "include[] securities of any company affected in some way by [an alleged]

7   misrepresentation," but meant simply "that the regulations [and securities laws] reach *all*

8   *types* of securities, and not *any affected company's* securities."  *Id.* at 32.  The court held

9   that individuals lack § 10(b) standing "when the company whose stock they purchased is

10  negatively impacted by the material misstatement of another company, whose stock they

11  do not purchase."  *Id.* at 34.

12         Here, as in *Nortel*, a plaintiff seeks to sue an entity other than the issuer of the

13  securities purchased.  Defendants contend that the court's denial of standing in *Nortel*

14  compels the same conclusion in this case.  However, unlike the plaintiffs in *Nortel*, who

15  purchased common stock, Plaintiff here purchased debt securities issued by an

16  investment bank.  From one perspective this difference is irrelevant.  Both common

17  stock and debt securities are "securities" under the securities laws.  15 U.S.C.

18  §§ 78c(a)(10), (11).  But from another perspective the difference between the two

19  securities is significant.  Unlike common stock, equity-linked debt securities are defined

20  in redemption value by reference to the value of stock in a company other than the issuer

21  of the debt securities.  Misstatements by JDSU affecting the price of JDSU stock bear a

22  "direct relationship" to the value of the GOALs because of the way the GOALs have

23  been defined, even though it was not JDSU that defined the GOALs in this way.  *Nortel*,

24  369 F.3d at 34.  Also, unlike common stock—but like stock in a merger target, *see*

25  *Nortel*, 369 F.3d at 33-34 (discussing *Semerenko*, 223 F.3d 165), and contingent rights to

26  acquire stock, *see Griggs*, 170 F.3d at 878—debt securities like GOALs make their

27  owners into potential holders of the linked corporation's common stock.  In buying

28  GOALs Plaintiff bought a specific "contractual right to receive [JDSU] stock" and

became a contingent purchaser of JDSU stock. *See Griggs*, 170 F.3d at 878. These differences preclude direct application of *Nortel* to the present case.

The Court also hesitates to apply *Nortel* to the present case because the Second Circuit's rationale in that decision is problematic. Although the Second Circuit's interpretation of "any security" is not plainly compelled by the statutory language, the court did not support its interpretation by extensive reasoning. *See* 369 F.3d at 32. The treatise the Second Circuit cites does not rule out the interpretation the Second Circuit rejects, but only notes the expansive meaning of "security" under § 10(b) and Rule 10b-5. *See* THOMAS LEE HAZEN, THE LAW OF SECURITIES REGULATION § 12.4[2] (5th ed. 2005). Moreover, the conclusion reached in *Nortel* is not compelled by *Blue Chip Stamps*. The plaintiffs in *Blue Chip Stamps* did not seek to sue a corporation other than the issuer of the securities they allegedly refrained from buying, so the Supreme Court did not need to address the question of which corporations would be proper defendants. (In general, standing analysis focuses on defining appropriate plaintiffs. *See Brody*, 280 F.3d at 1000.) Additionally, the proof problems the *Blue Chip Stamps* Court described in connection with claims of harm resulting from decisions not to act are not present in situations such as the present case or *Nortel*, where documentary proof of transactions is available.[5] *See* 421 U.S. at 741-46.

---

[5]In this regard the Second Circuit noted:

> [O]ral testimony would play a crucial role in proving that plaintiffs relied on [defendants'] financial projections when they purchased [the] securities at issue. . . . [W]here a plaintiff is bringing an action based on the statements of a company whose securities he did not purchase, "[p]laintiff's entire testimony would be dependent upon uncorroborated oral evidence of many of the crucial elements of his claims and still be sufficient to go to a jury." [*Blue Chip Stamps*, 421 U.S.] at 746.

*Nortel*, 369 F.3d at 33. The relevant discussion in *Blue Chip Stamps* is as follows:

> Without [a requirement that plaintiffs have purchased or sold securities, an] action under Rule 10b-5 will turn largely on which oral version of a series of occurrences the jury may decide to credit, and therefore no matter how improbable the allegations of the plaintiff, the case will be virtually impossible to dispose of prior to trial other than by settlement. . . . *The fact of purchase . . . and . . . sale of stock are generally matters which are verifiable by documentation, and do not depend upon*

(continued...)

**United States District Court**

*For the Northern District of California*

The Second Circuit's justifications for its interpretation are not strong or broad enough to justify adoption of that interpretation in this factual situation. Since there is no persuasive authority on point, the Court turns to Defendants' policy argument.

  D. *Purpose of Recognizing § 10(b) Private Right of Action*

Defendants correctly point out that "considerations of policy" are relevant to the issue of standing to bring an action under § 10(b). *Blue Chip Stamps*, 421 U.S. at 749. As noted, however, the policy considerations on which the Supreme Court relied in limiting standing in *Blue Chip Stamps* are not directly relevant to this case. The factual scenario presented by the Complaint does not inherently necessitate oral testimony to a jury for resolution. *Cf. id.* at 741-46.

Defendants argue that a conclusion that Plaintiff has standing to bring this action would be the type of "inexorable broadening of the class of plaintiff who may sue in this area of the law" forbidden by *Blue Chip Stamps*. 421 U.S. at 747. But while concluding that Plaintiff has standing would make the class of permissible plaintiffs larger than it would be if the Court reached the opposite conclusion, recognizing Plaintiff's standing

---

[5](...continued)
*oral recollection, so that failure to qualify [for standing] . . . can normally be established by the defendant either on a motion to dismiss or on a motion for summary judgment. . . .*

  [Without this rule, a p]laintiff's proof would not be that he *purchased or sold stock, a fact which would be capable of documentary verification in most situations,* but instead that he decided not to purchase or sell stock. Plaintiff's entire testimony could be dependent upon uncorroborated oral evidence of many of the crucial elements of that claim, and still be sufficient to go to the jury. . . .

421 U.S. at 741-46 (emphasis added). The Second Circuit in *Nortel* conflated the *Blue Chip Stamps* analysis of the difficulty of proving an omission to act with analysis of proof of reliance, which is an element of the plaintiff's prima facie case, not a standing requirement. *See Nortel*, 369 F.3d at 33. See also *Kircher v. Putnam Funds Trust*, 403 F.3d 478, 483 (7th Cir. 2005) ("The [Court in *Blue Chip Stamps*] observed that anyone can *say* that a failure to trade bore some relation to what the issuer did (or didn't) disclose, but that judges and juries would have an exceedingly hard time knowing whether a given counterfactual claim ('I would have traded, if only . . .') was honest. The Court thought it best to limit private actions to harms arising out of actual trading.").

1   does not create a slippery slope by permitting any investor to bring an action against any

2   corporation, as Defendants seem to contend.[6]

3       As noted, standing analysis focuses on defining appropriate plaintiffs.  *Brody*,

4   280 F.3d at 1000.  Permitting Plaintiff to sue here merely recognizes that unlike the

5   plaintiffs in *Blue Chip Stamps* she is a member of "the precise class for the protection of

6   which the 1934 Act [including § 10(b)] was enacted: participants in the national

7   securities markets," *Deutschman v. Beneficial Corp.*, 841 F. 2d 502, 507 (3d Cir. 1988),[7]

8   and that the GOALs' redemption value bore a "direct relationship" to the value of JDSU

9   stock on a particular date, *Nortel*, 369 F.3d at 33.  For these reasons, the Court concludes

10  that Plaintiff and other GOALs purchasers have standing to sue JDSU for securities

11  fraud.

12  **II.    SUFFICIENCY OF PLAINTIFF'S ALLEGATIONS**

13      Defendants have also moved to dismiss on the grounds that Plaintiff has not

14  sufficiently alleged that any misstatements were "in connection with" the GOALs, that

15  she relied on any misstatements, or that any misstatements were accompanied by

16  scienter.

17      *A.    Legal Standards*

18

19

20  [6]This is because only a limited set of plaintiffs will be able to allege the kind of direct
    relationship between one security and another that is contained in the definition of the GOALs in this
    case.

21      In making their argument that courts must resist any broadening of the class of plaintiffs
    entitled to sue under § 10(b), Defendants rely heavily on *Brody*.  280 F.3d 997.  In *Brody*, the Ninth

22  Circuit affirmed a rule limiting standing, in actions alleging insider trading, to plaintiffs who had
    traded contemporaneously with the alleged insider traders.  *Id.* at 1001.  The court reasoned that this

23  rule was necessary in part to limit the number of parties to whom securities fraud defendants could
    be liable.  *Id.*  But the court in *Brody* also based its conclusion on the fact that "noncontemporaneous

24  traders do not require the protection of [the securities laws] because they do not suffer the
    disadvantage of trading with someone who has superior access to information."  *Id.* (citing

25  *Neubronner v. Milken*, 6 F.3d 666, 669-70 (9th Cir. 1993)).  That is, noncontemporaneous traders by
    definition cannot suffer injury caused by fraudulent inside trades and thus are not the types of

26  individuals the securities laws were enacted to protect.

27      [7]The Supreme Court recently restated the purpose of securities fraud laws in general and
    private § 10(b) actions in particular: to "maintain public confidence in the marketplace" by

28  "protect[ing] investors against those economic losses that misrepresentations actually cause."  *Dura
    Pharms.*, 125 S. Ct. at 1633 (citing, inter alia, *United States v. O'Hagan*, 521 U.S. 642, 658 (1997)).

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1   Generally, a motion to dismiss for failure to state a claim should be denied unless

2   it appears that the plaintiff can prove no set of facts entitling the plaintiff to relief.  *See*

3   *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).  All material allegations in the complaint

4   are to be taken as true and construed in the light most favorable to the plaintiff, *see Daou*

5   *Systs.,* 397 F.3d at 709-10, although "conclusory allegations without more are

6   insufficient to defeat a motion to dismiss," *McGlinchy v. Shell Chemical Co.*, 845 F.2d

7   802, 810 (9th Cir. 1988).

8   Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful for any

9   person to "use or employ, in connection with the purchase or sale of any security . . . any

10  manipulative or deceptive device or contrivance."  15 U.S.C. § 178j(b); *see also*

11  17 C.F.R. § 240.10b-5 (Rule 10b-5).  To state a claim under § 10(b), a plaintiff must

12  allege a material misrepresentation, scienter, a connection with the purchase or sale of a

13  security, reliance, economic loss, and loss causation.  *Dura Pharms.*, 125 S. Ct. at 1631.

14  Special pleading rules apply to actions under § 10(b) and Rule 10b-5.  First, since

15  these provisions address fraud, they fall within the scope of Federal Rule of Civil

16  Procedure 9(b), which requires a plaintiff to plead fraud with particularity.  *In re Stac*

17  *Elec. Sec. Litig.*, 89 F.3d 1399, 1410 (9th Cir. 1996).  Allegations of fraud must be

18  "specific enough to give defendants notice of the particular misconduct which is alleged

19  to constitute the fraud charged so that they can defend against the charge and not just

20  deny that they have done anything wrong."  *Semegen v. Weidner*, 780 F.2d 727, 731 (9th

21  Cir. 1985).  The Private Securities Litigation Reform Act of 1995 (PSLRA), Pub. L. No.

22  104-67, 109 Stat. 737, further heightened pleading requirements in § 10(b) actions as to

23  allegations of the falsity of alleged misstatements and of the scienter, or state of mind,

24  accompanying those statements.  Thus, under the PSLRA, a plaintiff must "state with

25  particularity facts giving rise to a strong inference that the defendants acted with the

26  required state of mind [i.e., scienter]."  15 U.S.C. § 78u-4(b)(2).

27

28

B.      "In Connection With"

Defendants argue that Plaintiff does not allege statements "in connection with" the securities she purchased because the misstatements alleged were not made about the GOALs or by their issuer.  Defendants also argue that Plaintiff may base her securities fraud claim only on statements made during the class period, and that the only misstatements alleged during the class period occurred after purchase of the GOALs, so the misstatements alleged cannot have been "in connection with" the purchase of those securities.  Neither argument accurately reflects applicable law.

The "in connection with" language requires the plaintiff to "establish a connection between the . . . alleged misrepresentation and the security at issue." *Levine v. Diamanthuset, Inc.*, 950 F.2d 1478, 1486 (9th Cir. 1991).  This may be shown through misstatements that "relate to the nature of the securities, the risks associated with their purchase or sale, or some other factor with similar connection to the securities themselves." *Ambassador Hotel Co., Ltd. v. Wei-Chuan Inv.*, 189 F.3d 1017, 1026 (9th Cir. 1999).  A misstatement "need not relate to the investment value of the securities themselves, [but] it must have more than some tangential relation to the securities transaction."[8]  *Id.*

1.      Requirements regarding maker and subject of statements

JDSU argues that misstatements may be considered "in connection with" a transaction only where the statements are made by the issuer of the securities and/or refer to the securities in question.  The case law does not dictate such a bright-line rule.

---

[8] The Third Circuit has described the Ninth Circuit's approach to the "in connection with" requirement as follows:  "We therefore adopt the reasoning of the Second Circuit and the Ninth Circuit and hold that the Class may establish the 'in connection with' element simply by showing that the misrepresentations in question were disseminated to the public in a medium upon which a reasonable investor would rely. . . . [T]he Class is not required to establish that the defendant actually envisioned that members of the Class would rely upon the alleged misrepresentation when making their investment decisions."  *Semerenko*, 223 F.3d at 176 (citing *Ames Dep't Stores*, 991 F.2d at 965).

United States District Court

For the Northern District of California

Although JDSU cites cases applying the above principle,[9] Plaintiff cites cases in which, in contrast, courts have held that misstatements made by and/or about companies other than the issuer of the securities satisfied the "in connection with" requirement.  In *Worldcom*, for example, the court held that statements by a bank that issued equity-linked debt securities like the GOALs were "in connection with" the debt securities even though the statements concerned only the financial health of the corporation with whose share prices the debt securities were linked.  2004 WL 1434356, at *7, *8.  Similarly, in *Semerenko*, the Third Circuit held that a corporation's statements about itself could be "in connection with" securities in a merger target even though the merger never occurred.  223 F.3d at 170, 174-78.

Defendants do not offer a persuasive reason for rejecting the approach of these decisions.  The functional approach of these decisions is also consistent with the Ninth Circuit's flexible standard.  *See Ambassador Hotel*, 189 F.3d at 1026 (noting that element may be met by showing fraud "relate[d] to . . . some . . . factor with . . . [a] connection to the securities").  Misstatements concerning JDSU's financial health clearly had a "connection to" the GOALs, given the definition of GOALs' redemption value in terms of the value of JDSU common stock.  The Court declines to adopt a more rigid interpretation of the "in connection with" requirement.

2.      Requirements regarding timing of statements

Defendants also argue that any statements made before the proposed class period are not actionable and that statements following the date on which Plaintiff alleges she purchased her GOALs, at the start of the class period, cannot have been made "in connection with" that transaction.  This argument is also unsupported by the case law.

First, Defendants' theory excluding from consideration pre-class period statements would seem to preclude any securities fraud actions by purchasers of equity-backed debt securities, which normally are linked to securities that will have been issued

---

[9]*Saxe v. E.F. Hutton & Co., Inc.*, 789 F.2d 105 (2d Cir. 1986); *Gershon v. Wal-Mart Stores*, 901 F. Supp. 128 (S.D.N.Y. 1995).

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1   previously.  But Defendants do not provide any reason to conclude that Congress

2   intended such investors not to receive the protection of the securities laws.[10]

3       Defendants also err in generalizing the principle that "[i]n a securities class action

4   lawsuit, liability cannot attach to statements made either before or after the class period."

5   *In re Seagate Tech. II Sec. Litig.*, 1995 WL 66841, at *4 (N.D. Cal. Feb. 8, 1995).  This

6   statement accurately describes how the scope of a class period coincides with the timing

7   of actionable statements in the traditional securities fraud action, but it does not make

8   sense in an action like this one.

9       The purpose of defining a plaintiff class, through dates or otherwise, is to limit the

10  class of plaintiffs to those ascertainable individuals who have standing to bring the

11  action.  *See* ALBA CONTE & HERBERT NEWBERG, 1 NEWBERG ON CLASS ACTIONS §§ 2.3

12  (4th ed. 2002) (addressing class definition, scope, and member identification), 6.14

13  (addressing prefiling definition of plaintiff class).  Definition of the plaintiff class is not

14  a device for limiting the universe of actionable conduct,[11] even though, in the standard

15  securities fraud action, the class period also happens to be the same as the period "during

16  which defendants' fraud was allegedly alive in the market."  *In re Clearly Canadian Sec.*

17  *Litig.*, 875 F. Supp. 1410, 1420 (N.D. Cal. 1995).  This overlap occurs simply because it

18  is only those plaintiffs who traded in the securities at issue while the fraud could have

19  been affecting those securities' value who can possibly state a claim for damage

20  resulting from the fraud.  *See Basic Inc. v. Levinson*, 485 U.S. 224, 228 & n.5 (1988).

21

22  [10]Defendants have contended that recognizing the potential liability of securities issuers to
    holders of securities that the defendants did not issue but that are backed by the defendants'
23  securities, like the GOALs, will increase the insurance needs of the defendants, harming their own
    shareholders.  As noted above, however, courts have consistently found the principal purpose of the
24  Securities Exchange Act to be the protection of investors in the securities markets, and the Act
    defines "security" broadly.  *See* note 5, *supra*; *see also* 15 U.S.C. § 78c(a)(10) (defining "security").
25  Defendants' argument does not compel the conclusion that Congress would have intended to exclude
    holders of equity-backed securities from the benefit of the securities laws.
26

27  [11]Thus, in other types of class actions, plaintiff classes sometimes include only members
    injured by acts alleged to have occurred before the opening of the class period.  *See, e.g.*, *Payton v.*
28  *Abbott Labs.*, 551 F. Supp. 245 (D. Mass. 1982) (holding that plaintiff class should be defined by
    reference to dates when symptoms first appeared in putative plaintiffs whose mothers ingested
    diethylstilbestrol during pregnancy).

United States District Court

For the Northern District of California

1    For these reasons, it is generally true that in the standard securities fraud class

2    action, "liability cannot attach to statements made either before or after the class

3    period."[12]  *Seagate Tech. II*, 1995 WL 66841, at *4.  But this analysis does not apply to

4    an action concerning securities like the GOALs.  Plaintiff alleges that the value of the

5    securities she purchased was distorted by fraud relating to the value of pre-existing

6    linked securities; she asserts a causal connection between the misstatements and the

7    GOALs' value.  *See Ambassador Hotel*, 189 F.3d at 1026.  Such a relationship could

8    exist only while the GOALs existed.  It would make no sense to begin the class period at

9    the point at which the alleged fraud began to affect the value of JDSU stock, without any

10   further effect on the value of GOALs.

11       On its face, Plaintiff's proposed class definition serves the purposes it is supposed

12   to serve:  It defines a group of plaintiffs all of whom were injured in the same way, if any

13   were.  The fact that the proposed class period begins after the first of the alleged

14   misstatements does not make those earlier statements irrelevant or not actionable.  The

15   Court rejects the argument that Plaintiff cannot maintain an action on the basis of

16   statements made before the proposed class period.  Although some such statements may

17   have a stronger connection with the GOALs and the claimed injury than others, the

18   strength of these connections is not an issue to be considered at this stage in the action.

19       *C.    Reliance*

20       Defendants also argue that Plaintiff does not sufficiently plead reliance.  A

21   securities fraud plaintiff may plead actual reliance on alleged misstatements or, in a class

22   action involving securities traded in an efficient market, invoke the "fraud on the

23   market" rebuttable presumption of reliance to satisfy this element of the plaintiff's prima

24   facie case.  *Basic Inc.*, 485 U.S. at 245-47; *Binder v. Gillespie*, 184 F.3d 1059, 1064-65

25   (9th Cir. 1999).  This presumption is based on the assumption that "[a]n investor who

26

27       [12]Although this generally holds true, even under the standard model statements or actions
preceding the class period may sometimes be relevant and/or actionable.  *See, e.g.*, *In re Crown Am.*
28   *Realty Trust Sec. Litig.*, 1997 WL 599299, at *15-*16 (W.D. Pa. Sept. 15, 1997) (rejecting *Seagate*
and citing securities fraud cases taking pre-class period statements into account).

1    buys or sells stock at the price set by the market does so in reliance on the integrity of

2    that price." *Basic Inc.*, 485 U.S. at 247.  A market price is assumed to have integrity

3    only insofar as it is the product of an efficient market.  *Id.* at 246 (noting that only an

4    efficient market reflects "all publicly available information, and, hence, any material

5    misrepresentations").  To benefit from the presumption plaintiffs therefore need to show

6    that the securities in question were traded on an efficient market.  *Binder*, 184 F.3d at

7    1064-65.  Assessment of the market's efficiency is above all a means of determining

8    whether a security's market price incorporates all extant public information material to

9    the value of the security.  *Basic Inc.*, 485 U.S. at 245-46.

10         Securities fraud plaintiffs may also benefit from presumptions of reliance in

11   certain other specific contexts.  For instance, where a positive duty to disclose

12   information exists, a plaintiff need not provide "positive proof of reliance."  *Basic Inc.*,

13   485 U.S. at 243 (citing *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153-54

14   (1972)).  Where the misstatements appeared in a proxy statement, a plaintiff need not

15   prove that the misstatements "decisively affected voting, because the proxy solicitation

16   itself [is presumed to have] . . . served as an essential link in the transaction."  *Basic Inc.*,

17   485 U.S. at 243 (citing *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 384-85 (1970)).

18         Defendants argue that Plaintiff may not invoke a presumption of reliance because

19   she has not alleged an efficient market for GOALs, because the efficiency of the market

20   for JDSU common stock is irrelevant to the question of her reliance, and because the

21   presumption is unavailable in the context of an initial public offering.[13]  These arguments

22   misconstrue the theory of reliance advanced by Plaintiff.

23         Plaintiff alleges that JDSU common stock was traded on an efficient market, AC

24   ¶ 214, and that the GOALs prospectus, which explained the securities' definition and

25   redemption value, drew a direct relationship between the price of JDSU common stock

26

27        [13]Defendants also argue that the complaint should be dismissed because Plaintiff fails to
     allege actual reliance.  In her opposition Plaintiff claims to have pleaded "direct reliance," but her
28   argument in this connection is indistinguishable from the theory outlined in this discussion, so this
     Order does not address it separately.

*United States District Court*

*For the Northern District of California*

United States District Court

For the Northern District of California

1    on the dates of the GOALs' issuance and redemption and the value of the GOALs at

2    redemption.  AC ¶¶ 4, 6, 31-46.  Plaintiff's theory is that GOALs purchasers may be

3    presumed to have relied on the GOALs prospectus and on the integrity of the market

4    price of JDSU common stock when the GOALs were issued, since that price was

5    incorporated into the redemption value and thus the overall value of the GOALs.  *See*

6    AC ¶¶ 4, 39, 40; *cf. Basic Inc.*, 485 U.S. at 245-46; *Chu v. Sabratek Corp.*,

7    100 F. Supp. 2d 815, 826 (N.D. Ill. 2000) (allowing holder of convertible notes to invoke

8    presumption of reliance by pleading efficient market in securities into which notes were

9    convertible); *McEwen v. Digitran Sys.*, 160 F.R.D. 631, 637 (D. Utah 1994) (same).[14]

10   On this theory, the relevant market is the market for JDSU stock at issuance and

11   purchase or sale of GOALs.

12        Defendants argue that courts have rejected such a theory, but the only authority

13   they cite is distinguishable.  *In re MDC Holdings Securities Litigation*, 754 F. Supp. 785,

14   805 (S.D. Cal. 1990).  *MDC Holdings* was a class action brought by purchasers of

15   securities including subordinated notes issued by the defendant.  *Id.* at 791, 804.  The

16   plaintiffs alleged an efficient market in the defendant's common stock but not

17   specifically in the subordinated notes.  *Id.* at 804-05.  The court declined to adopt the

18   presumption as to the subclass of subordinated note holders because the subclass had

19   neither pleaded that the market for the notes themselves was efficient, differentiated

20   between notes and common stock in the relevant portion of the complaint, nor advanced

21   any other theory supporting a presumption of reliance.  *See id.* at 804-05.  Rather, they

22   had made a "conclusory, generic reference to the market price for MDC securities,"

23   including both common stock and subordinated notes.  *Id.* at 805.  Plaintiff here, in

24   contrast, has clearly and in detail alleged a direct relation between the market price of

25

26        [14]Defendants stress that *Chu* and *McEwen* involved securities convertible at the holders' will
     into common stock.  *Chu*, 100 F. Supp. 2d at 826; *McEwen*, 160 F.R.D. at 637.  Clearly, the cases are
27   distinguishable in this sense.  Nevertheless, plaintiffs in both cases had purchased securities whose
     values, like the value of the GOALs here, were dependent both on the value of the common stock
28   into which they were convertible and on other factors.  In both cases, the courts held that the possible
     influence of other factors on the value of the convertible notes did not preclude the plaintiffs from
     invoking presumptions of reliance on the integrity of the common stock's market price.

United States District Court

For the Northern District of California

JDSU common stock on the dates of the GOALs' issuance and redemption and the value of the GOALs. AC ¶¶ 4, 6, 31-46. This relationship is part of the definition of the GOALs. Defendants cite no authority indicating that holders of derivative securities may not benefit from a presumption of reliance if they plead such an explicit connection between their securities' value and the price of other securities.

Defendants further argue that the connection asserted is not direct enough to allow Plaintiff to benefit from a presumption of reliance. Defendants point out that the GOALs prospectus acknowledges that factors other than the price of JDSU common stock could affect the value of the GOALs and that the prospectus states that the relationship between the market value of GOALs and the market price of JDSU common stock is not a direct one. Defendants further assert that, historically, stronger correlations have existed between the prices of JDSU common stock and, for instance, Nortel common stock than ever existed between the price of JDSU stock and the price of GOALs.[15] Moreover, even if the price of JDSU stock has some relationship to the value of GOALs, Defendants contend, the price of GOALs cannot have incorporated any information about JDSU since the GOALs did not trade on an efficient market.

These arguments are unsuccessful for two reasons. First, while factors other than the price of JDSU stock might have affected the value of the GOALs on any given day, this is irrelevant to the directness of the relationship between the price of JDSU stock at issuance and redemption of the GOALs, on the one hand, and the value of the GOALs, on the other. Courts have found that holders of convertible subordinated notes may benefit from presumptions of reliance even though the notes' values would presumably have been affected by factors other than the price of the note issuers' common stock. *See Chu*, 100 F. Supp. 2d at 826; *McEwen*, 160 F.R.D. at 637. For these reasons, the

---

[15]In this connection, Defendants have argued that the Complaint falls short of the pleading requirements of Federal Rule of Civil Procedure 9(b) because Plaintiff does not assert a sufficiently tight correlation between GOALs and JDSU stock prices. For the reasons presented the Court concludes that, assuming Rule 9(b)'s requirements apply in the context of presumptions of reliance, Plaintiff has pleaded the relationship between the GOALs' value and JDSU stock price with sufficient particularity to satisfy Rule 9(b).

United States District Court

For the Northern District of California

statement in the GOALs prospectus that the relationship between GOALs value and JDSU stock price is not a "direct" one, and the factual question of the actual correlation between GOALs and JDSU stock prices, do not dispose of the question of Plaintiff's reliance, as Defendants contend.

Second, Defendants' argument assumes that material misstatements may be presumed to be relied on in purchasing decisions only through the setting of prices by an efficient market. This assumption is inaccurate; as noted above, the Supreme Court permits securities fraud plaintiffs to benefit from presumptions of reliance in other contexts. *See Basic Inc.*, 485 U.S. at 243 (citing *Affiliated Ute Citizens*, 406 U.S. at 153-54; *Mills*, 396 U.S. at 384-85). Similarly, courts in the Ninth Circuit have adopted an "integrity of the regulatory process" theory permitting plaintiffs to invoke a presumption of reliance in the context of initial public offerings. *See MDC Holdings*, 754 F. Supp. at 806. The GOALs' issuer expressly defined the GOALs' redemption value in terms of the value of JDSU common stock on the date of the GOALs' issuance and thereafter. Since GOALs purchasers presumably understood what they were purchasing, the definition of the GOALs in terms of JDSU stock price must be presumed to have been "an essential link in the transaction" leading to any purchase of the GOALs. *See Basic Inc.*, 485 U.S. at 243 (citing *Mills*, 396 U.S. at 384-85). The fact that GOALs purchasers may also have relied on other information in making their purchasing decisions does not negate the presumption that given the definition of the GOALs they must also have been relying on the integrity of the price of JDSU stock. *See Basic Inc.*, 485 U.S. at 241-44. Defendants are free to attempt to rebut this presumption with specific factual showings later in this litigation. *See id.* at 248-49.

Finally, Defendants have maintained that purchasers of securities in an initial public offering may not benefit from a presumption of reliance. It is not clear that this is Ninth Circuit law. *See MDC Holdings*, 754 F.3d at 806. At any rate, the argument is irrelevant to the present case because the efficiency of the market for GOALs is not at issue. Defendants also make the related contention that Plaintiff may not invoke the

1   presumption because UBS, and not the market, set the price of GOALs.  As noted,

2   however, this contention is only partly accurate.  UBS set the GOALs' issuance and

3   redemption dates and face value but also expressly defined their redemption value in

4   relation to the market price of JDSU stock.  UBS thus delegated part of its task of

5   defining the GOALs' value to the efficient market in JDSU common stock.  Defendants'

6   contention that the market could have played no role in a purchaser's decisions to

7   purchase GOALs cannot be sustained.

8        Plaintiff's theory of reliance is novel, but it is a logical extension of existing

9   doctrine.  The Court cannot say, under these circumstances, that plaintiff has pleaded "no

10  set of facts in support of [her] claim which would entitle [her] to relief."  *Conley v.*

11  *Gibson*, 355 U.S. at 45-46.

12       *D.     Scienter*

13       Defendants contend that Plaintiff has not sufficiently pleaded scienter.  In the

14  securities fraud context, scienter is "a mental state embracing intent to deceive,

15  manipulate, or defraud" and must be alleged as part of a § 10(b) claim.  *Ernst & Ernst v.*

16  *Hochfelder*, 425 U.S. 185, 193 n.2 (1976).  Scienter includes some forms of

17  recklessness.  *See Nelson v. Serwold*, 576 F.3d 1332, 1337 (9th Cir. 1978).  Such

18  recklessness is a form of intentional conduct, not an extreme form of negligence.  *In re*

19  *Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 976-77 (9th Cir. 1999).  In *Silicon*

20  *Graphics*, the Ninth Circuit described it as "deliberate recklessness."  *Id.* at 977.

21       Thus, in the Ninth Circuit, a plaintiff must plead with particularity "facts giving

22  rise to a strong inference that the defendant acted with," at minimum, deliberate

23  recklessness.  15 U.S.C. § 78u-4(b)(2); *Silicon Graphics*, 183 F.3d at 977.  Facts

24  establishing only motive and opportunity, or circumstantial evidence of "simple

25  recklessness," are insufficient to create a strong inference of deliberate recklessness.  *See*

26  *Silicon Graphics*, 183 F.3d at 979.  However, we assess the sufficiency of scienter

27  allegations based on the totality of the allegations in the complaint, even if allegations

28  are "individually lacking."  *Nursing Home Pension Fund v. Oracle Corp.*, 380 F.3d

United States District Court

For the Northern District of California

1226, 1230 (9th Cir. 2004) (citing *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp.*, 320 F.3d 920, 938 (9th Cir. 2003)).

Defendants argue that Plaintiff's allegations fall short of these standards in two ways: (1) Plaintiff may not rely on allegations of events from before the proposed class period to show scienter, and (2) as to alleged misstatements during the class period, Plaintiff fails to allege contemporaneous facts indicating "the deliberately reckless false and misleading nature of the statements when made." *In re Read-Rite Corp. Sec. Litig.*, 335 F.3d 843, 846 (9th Cir. 2003).  Neither argument is successful.

> 1.   Facts relating to scienter before proposed class period

Defendants' first argument is similar to their argument about whether statements from before the proposed class period might be "in connection with" the GOALs.  The analysis above also applies here.  The proposed class period dates function only to define the plaintiff class, not to restrict the universe of relevant or actionable facts in this case.

Plaintiff here alleges facts relating to scienter dating from before the proposed class period because by definition scienter is the state of mind accompanying misstatements forbidden by § 10(b).  *See Hochfelder*, 425 U.S. at 193 n.2.  If misstatements alleged before the class period are relevant to her case, then facts indicating the contemporaneous state of mind of the individuals making those alleged misstatements are as well.

With respect to the particularity with which she has alleged these facts, Plaintiff notes that in the related securities fraud action brought by JDSU shareholders, substantially identical allegations were held sufficient to support an inference of scienter. *See* Order Den. Mot. to Dismiss, *In re JDS Uniphase Corp. Sec. Litig.*, No. 02-04186, at 16-20 (N.D. Cal. Jan. 6, 2005).  Although this Court is not bound by the rulings in the related action, it makes sense for this Court to consider those rulings.

In its Order of January 6, 2005, addressing the defendants' renewed motion to dismiss in that action, the district court noted that the plaintiffs had alleged insider sales of JDSU stock by officer defendants as well as internal records available to those

21

defendants and contradicting their contemporaneous public statements regarding JDSU's sales and demand figures.  The court reasonably concluded that these allegations, taken together, created "a strong inference that [the officer defendants] all knowingly made false statements."  Order at 19.  Plaintiff in the present case pleads all of the same facts.  *See, e.g.*, Compl. ¶¶ 28, 29, 58, 61, 104, 115, 171-72, 175-78, 179, 180, 189-94.  The relationship of the proposed class periods to the fraud alleged in the two cases is the only difference arguably relevant to scienter between the allegations in the two complaints.  But, as noted, the difference between the proposed class period in this case and the period of alleged fraud is not relevant to the sufficiency of this Complaint.  There is thus no reason for this Court not to reach the same conclusions regarding scienter as the district court reasonably reached in the related action.

2.      Facts relating to scienter during proposed class period

Defendants' second argument is that as to the three alleged misstatements occurring during the class period, Plaintiff does not plead contemporaneous facts supporting an inference of scienter.  Plaintiff correctly responds that she need not allege facts dating specifically from the months between March and July 2001 to support an inference of scienter during that period.

Indeed, the cases defendants cite in support of their argument indicate that facts relevant to scienter will ordinarily date from before any alleged misrepresentations.  *See Read-Rite*, 335 F.3d at 845;[16] *In re CornerStone Propane Partners, L.P., Sec. Litig.*, 355 F. Supp. 2d 1069, 1093-94 (N.D. Cal. 2005);[17] *see also In re The Vantive Corp. Sec.*

---

[16]In *Read-Rite*, the court found insufficient to support an inference of scienter officers' post-fraud admissions of general prior knowledge about the defendant corporation's state.  335 F.3d at 846-47.  The admissions were insufficient because they lacked specificity and postdated the alleged misstatements, not because they were not exactly contemporaneous with the alleged misstatements.  *Id.* at 847.

[17]Defendants cite *CornerStone* for the rule that a plaintiff must "allege *contemporaneous* facts in sufficient detail and in a manner that would create a strong inference that the alleged adverse facts were known *at the time of the challenged statements.*"  Defs.' Mot. at 18 (quoting *CornerStone*, 355 F. Supp. 2d at 1093-94) (emphases added by defendants).  *CornerStone* quoted this language directly from *In re The Vantive Corp. Securities Litigation*, 283 F.3d 1079, 1085 (9th Cir. 2002).

(continued...)

United States District Court

For the Northern District of California

*Litig.*, 283 F.3d 1079, 1085 (9th Cir. 2002).  This conclusion is also supported by common sense.  Showing scienter is a matter of showing facts known to or knowable by the makers of alleged misstatements at the time the statements were made.  15 U.S.C. § 78u-4(b)(2); *Silicon Graphics*, 183 F.3d at 977.  Allegations supporting an inference of scienter must often refer to circumstances preceding the statements, since such circumstances would be among those knowable at the time of the statements.  While the scienter itself must be contemporaneous with the alleged misstatements, facts supporting the inference of scienter will not always be.  *Cf. In re Splash Tech. Holdings Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1072 (N.D. Cal. 2001) ("[T]he complaint must allege that the 'true facts' arose *prior* to the allegedly misleading statement.").

While this Court is not bound by the district court's rulings in the related securities fraud action, the fact that the present action involves a different class period is not in itself a basis for rejecting those rulings.  For the reasons noted, this Court holds that Plaintiff has pleaded scienter adequately.

## III.    KALKHOVEN'S MOTION TO DISMISS

Kevin Kalkhoven, JDSU's CEO from June 1999 to May 2000, has separately moved for dismissal of the action against him.  In addition to adopting all of the arguments addressed above, he maintains that (1) the Complaint fails to allege any misstatements by Kalkhoven himself during the proposed class period; (2) the Complaint fails to plead that any statements about demand by Kalkhoven caused losses to the plaintiffs; and (3) the Complaint fails to plead scienter sufficiently as to alleged statements regarding revenue recognition by Kalkhoven.

[17](...continued)
The facts in *The Vantive* are similar to those in *Read-Rite*, and the court similarly concluded that plaintiffs could not "speculate in hindsight that earlier projections . . . must have been false for failure to disclose adverse facts."  *The Vantive*, 283 F.3d at 1085.  Neither *CornerStone* nor *The Vantive* holds that facts supporting scienter must be contemporaneous with any misstatements; if anything, they imply that facts relevant to scienter ordinarily precede the alleged misstatements.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1    The first of these arguments depends on the class period timing argument

2  discussed above.  This argument fails for Kalkhoven just as it does for the other

3  defendants.[18]  Kalkhoven's other two arguments are addressed in turn below.

4         1.    Sufficiency of allegations of loss causation as
                to alleged misstatements about demand
5

6    Kalkhoven contends that Plaintiff has failed to allege "loss causation" as to him,

7  since any misstatements about demand attributable to him occurred so long before

8  GOALs purchasers could have suffered any damage that Plaintiff's alleged loss can only

9  be the result of causes postdating Kalkhoven's retirement.   Kalkhoven Reply at 7.

10    Allegations of "loss causation" are a necessary element of a § 10(b) claim and

11 require a plaintiff to plead "a causal connection between the material misrepresentation

12 and the loss" the plaintiff suffered.  *Dura Pharms.*, 125 S. Ct. at 1631.   Loss causation is

13 "equivalent to proximate causation in tort."  *Binder*, 184 F.3d at 1066 (internal quotation

14 marks and citations omitted).   The "plaintiff must show that the fraud caused, or at least

15 had something to do with," the plaintiff's loss.  *Id.*  On their own, allegations that the

16 purchase price of a security was inflated due to alleged misstatements do not state a

17 claim with respect to either economic loss or loss causation.  *Dura Pharms.*, 125 S. Ct. at

18 1631-32, 1634-35.

19    Plaintiff does not dispute that other factors may have influenced the GOALs'

20 value but takes the position that Kalkhoven's pre-class period statements "remained

21 'alive in the market' until" at least the issuance of the GOALs.  Pl.'s Opp'n at 11.  This

22 is not simply an assertion that the GOALs' value was inflated at issuance due to

23 manipulation of the market value of JDSU stock by JDSU officers, including Kalkhoven.

24 *Cf. Dura Pharms.*, 125 S. Ct. 1631-32, 1634-35.  Since the GOALs' value following

25

26         [18]The second count in the Complaint alleges that the individual defendants are liable as
   "controlling persons" under § 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a).
27 Compl. ¶ 233.  Straus, Muller, and Abbe do not separately argue for dismissal of this claim, but
   Kalkhoven argues that he should be dismissed as to this claim because as of the class period he was
28 not a JDSU officer.  Kalkhoven Mot. at 16.  This is yet another version of the flawed argument
   concerning liability for acts outside the class period and is rejected accordingly.

1    issuance was tied to the relationship between the price of JDSU stock at issuance of the

2    GOALs and the price of JDSU stock at the GOALs' redemption, the Court takes

3    Plaintiff also to be asserting losses flowing from the decline in post-GOAL-issuance

4    price of JDSU stock, a decline magnified by the extent of the correction necessary and

5    thus, in part, a consequence of the degree to which JDSU's stock price was inflated at

6    issuance of the GOALs. *See, e.g.*, AC ¶ 4, 6, 31-46. These allegations suffice to assert

7    that the alleged misstatements about demand by the individual defendants, including

8    Kalkhoven, before issuance of the GOALs had "something to do with" the prices of

9    JDSU stock at various times and, therefore, with plaintiff's alleged losses. *Binder*,

10   184 F.3d at 1066.

11         In connection with causation Kalkhoven also points out that Plaintiff contends

12   that "to be actionable a misrepresentation need only be a 'substantial cause' of the

13   investors [sic] injury," Pls' Opp'n at 6 n.5 (citing *Semerenko*, 223 F.3d at 186-87).

14   Kalkhoven maintains that Plaintiff's allegations establish that she cannot possibly make

15   this showing of substantial cause. According to Kalkhoven, the nine-month lapse

16   between his final alleged misstatement regarding demand for JDSU products in May

17   2000 and the issuance of the GOALs in March 2001, coupled with the numerous

18   statements about demand made by others during that period, would preclude any rational

19   finding that Kalkhoven's statements were a "substantial cause" of Plaintiff's losses.

20         The Court cannot accept this argument. The cited language from *Semerenko* goes

21   to a securities fraud plaintiff's burden of proof at trial, and the Third Circuit indicated in

22   that opinion that the substantiality of the link between misstatement and loss is not a

23   question appropriate for consideration on a motion to dismiss. *See* 223 F.3d at 187

24   ("[T]he defendants may disprove that the Class suffered a loss as a result of the alleged

25   misrepresentations by showing that the misrepresentations were not a substantial factor

26   in setting the price of [the] common stock during the class period, [but] we disagree that

27   the defendants may do so at this stage of the proceedings."). The cases that Kalkhoven

28   cites to support the conclusion that nine-month-old statements about demand cannot, as a

United States District Court

For the Northern District of California

1   matter of law, be found to be substantial causes of loss are factually distinct and do not

2   support a similar conclusion here.[19]

3                2.      Sufficiency of allegations of scienter as to
                        alleged fraudulent revenue recognition
4

5          Finally, Kalkhoven notes that Plaintiff must allege scienter in connection with

6   each alleged misstatement, *see* 15 U.S.C. § 78u-4(b)(2) (providing that "the complaint

7   shall, with respect to each act or omission alleged to violate this chapter, state with

8   particularity facts giving rise to a strong inference that the defendant acted with the

9   required state of mind"), and argues that she has failed to allege sufficiently that

10  Kalkhoven acted with the required state of mind in making allegedly false and

11  misleading statements about JDSU's revenue in SEC filings in late 1999 and early 2000.

12  *See* AC ¶¶ 85, 93.  Kalkhoven contends that in this connection Plaintiff cites only the

13  assertions of a confidential informant that a JDSU employee who reported to Kalkhoven

14  approved fake late-quarter shipments of products to inflate revenues.  *See* AC ¶ 54(a).

15

16         [19] In *Rand v. Cullinet Software*, the District Court for the District of Massachusetts held that
17  no reasonable juror could find that a ten-month-old statement regarding "pipeline" prospects of
    demand for the defendant company's products was a substantial cause of the plaintiffs' alleged
    losses.  847 F. Supp 200, 210 (D. Mass. 1994).  However, the court based this conclusion in part on
18  the fact that "no statements were made regarding [the defendants'] pipeline" following the statement
    in question.  *Id.*  Not backed up by subsequent corroborating statements, the alleged misstatement
19  became stale after a certain period of time.  *See id.*  Here, in contrast, Kalhoven concedes that
    numerous other statements reiterating the substance of his alleged misstatement about demand
20  followed his own statement.  *Rand* does not indicate that no reasonable jury could find that
    Kalkhoven's statement combined in some way with these other statements to become a substantial
21  cause of Plaintiff's loss.
           In *In re Time Warner, Inc., Securities Litigation*, the District Court for the Southern District
22  of New York held that an officer's alleged misstatement concerning the value of the corporation's
    stock, made ten months "before the asserted class period, . . . cannot have formed a basis for
23  plaintiffs' expectations when they purchased shares ten or more months later," "since innumerable
    intervening factors could have changed the company's value since Levin spoke."  794 F. Supp. 1252,
24  1260 (S.D.N.Y.), *aff'd in part, rev'd in part*, 9 F.3d 129 (2d Cir. 1992).  In *Time Warner*, however,
    the alleged misstatement directly concerned the value of the corporation's stock at the time of the
25  statement.  *Id.* at 1259 (characterizing statement as officer's "somewhat hyperbolic opinion of the
    company's inherent worth as of February 1990").  Moreover, like the alleged misstatement in *Rand*,
26  it was not followed by subsequent similar statements.  Thus, its relevance and its effects were limited
    in time.  Kalkhoven's statement about demand cannot be separated from prior and subsequent
27  statements about demand by other directors in the same way.  Given a context of consistent
    statements over an extended period, a reasonable trier of fact could conclude that the statements
28  cumulatively had a substantial effect on JDSU stock prices over that period, and that individual
    statements all contributed to the effect.

**United States District Court**

For the Northern District of California

1   According to Kalkhoven, this assertion is "the only thing in the complaint about revenue

2   recognition," and it is insufficient to support a "strong inference" that Kalkhoven made

3   any false statements about revenue with scienter.  15 U.S.C. § 78u-4(b)(2); *Silicon*

4   *Graphics*, 183 F.3d at 977.

5        The Court concludes that Plaintiff's allegations of scienter in connection with

6   these alleged misstatements are insufficient for the reasons presented by Kalkhoven.

7   Although Plaintiff does allege with particularity that Kalkhoven had access to and

8   recieved printouts from JDSU's Oracle database system showing "customer orders,

9   shipments, sales, and inventory levels," AC ¶ 171, the Complaint does not indicate that

10  the database system contained information about the alleged fraudulent shipment

11  practice.  The assertion that the practice was known to one of Kalkhoven's subordinates

12  does not support a strong inference that Kalkhoven also knew about the practice.  *See* 15

13  U.S.C. § 78u-4(b)(2); *Silicon Graphics*, 183 F.3d at 979 (requiring factual basis for

14  "strong inference" that defendant acted with "deliberate or conscious recklessness").

15       Despite the insufficiency, Kalkhoven concedes that it is not apparent from the

16  Complaint that this defect may not be cured through amendment.  The Court therefore

17  grants Kalkhoven's motion to dismiss with respect to Kalkhoven's revenue statements,

18  with leave to amend, but denies the motion with respect to Kalkhoven's statements about

19  demand.

20                                **CONCLUSION**

21       For the reasons stated, the JDSU Defendants' motion to dismiss is **DENIED**.

22  Defendant Kalkhoven's motion to dismiss is **GRANTED** in part, with leave to amend

23  within 20 days.

24       **IT IS SO ORDERED.**

25  Dated:  July 13, 2005

                                _____

26                              WILLIAM W SCHWARZER
                                SENIOR UNITED STATES DISTRICT JUDGE

27

28